HARRY MILLER, *et ux.,* v. BAY-TO-GULF, INC., THE MADERIA CONSTRUCTION COMPANY, INC., THE MADERIA HOLDING COMPANY, INC., MAE V. BRUSH, a Widow, and A. B. ARCHIBALD.

193 So. 425

Division B

Opinion Filed January 26, 1940

*W. G. Ramseur,* for Appellants;

*Edwin R. Dickenson* and *Robert W. Patton,* for Appellees.

PER CURIAM.—This cause of action involves a small strip of land located on Maderia Island near St. Petersburg, Florida, and bordering on the Gulf of Mexico. In 1927 The Maderia Holding Company, Inc., was the owner of a large tract of land on the aforementioned Maderia Island. The company caused a partial plat to be made of the property, showing Blocks and Lots thereon, and known as Maderia Beach Subdivision. This plat shows the westerly boundary of Blocks 5, 7, 9 and 13 abutting the waters of the Gulf of Mexico, while the westerly boundary of Blocks 1 and 3 are shown abutting on a strip of land approximately 100 feet in width, lying between Blocks 1 and 3 and the waters of the Gulf.

The herein disputed property is a part of that unplatted strip of land lying between the westerly boundary lines of Blocks 1 and 3 of the subdivision and the waters of the Gulf of Mexico.

In 1931, A. B. Archibald, then president of Maderia Holding Company, Inc., entered into an agreement with the appellants for the sale of Lot 6 of Block 3 of Maderia Beach Subdivision. Appellants immediately entered into possession of the premises and moved five cottages onto the property.

Appellants received a warranty deed to the property from Maderia Holding Company, Inc., on April 19, 1932. The descriptions in both the contract of sale and in the deed being according to the plat of Maderia Beach Subdivision. Although there was no mention of the fact made in the purchase agreement it is shown upon the face of the deed that the plat was unrecorded.

The appellants were subsequently informed by the tax collector that in order to pay taxes on their property it

would be necessary to have a description of the premises by metes and bounds because the plat of Maderia Beach Subdivision had never been recorded. Appellants then demanded and received on May 7, 1935, a deed from Maderia Holding Company, Inc., conveying Lot 6 of Block 3 by metes and bounds.

Due to erosion along the shore of the Gulf, Miller in 1932 or 1933 erected a bulkhead about two feet west of his westerly boundary line. Again in 1935 Miller caused a second bulkhead or sea wall to be erected on the land now controverted. This second wall is slightly more than five feet west of appellants' westerly boundary.

In 1936, appellee Maderia Holding Company, Inc., sold the strip of land between appellants' westerly boundary line and the Gulf to Mae V. Brush, and received from the vendee a purchase money mortgage covering the property described in the deed. Mae V. Brush, joined by her husband, C. H. Brush, and Bay-to-Gulf, Inc., entered into an agreement whereby Mae V. Brush was to convey the property involved to Bay-to-Gulf, Inc., upon the performance of certain conditions by the corporation.

In 1937 appellants were notified by appellees Maderia Construction Company, Inc., acting as agent for appellee Bay-to-Gulf, Inc., to remove the sea wall within five days or legal steps would be taken to remove the same.

Appellants filed their bill of complaint against appellees praying for an injunction restraining appellees from demolishing the bulkhead and that appellant's title be quieted against any claim of appellees. Appellees filed answers in which they sought to restrain appellants from further maintaining the bulkhead upon the lands of appellees.

At the close of the testimony the chancellor entered his decree permanently enjoining appellants from interfering

with or attempting to interfere with the rights of appellees to the use and enjoyment of the strip of land in question.

Appellants insist that the final decree attempted to quiet title to the lands in favor of appellees upon an unsworn answer when the lands were in actual possession of appellants and when no proper predicate was laid by necessary averments in such answer to justify such relief. In answer to this we state that the final decree adjudicated that the appellants had no right, title or interest in the lands and that appellants should thereafter be permanently enjoined from interfering with the rights of appellees.

The lower court was clearly within its province when it allowed the relief that was granted in this case. If, after hearing all the testimony, the chancellor had only dismissed the suit, it would have then been necessary for appellees to relitigate the same issues in order to gain possession of the rights which the lower court decided the appellees were entitled to. The answer in the instant case contained all the necessary averments along with a prayer for general relief. It is a well settled principle of law, and oft stated by this court, that a court of equity once having properly taken jurisdiction of the parties and the subject matter of a cause, will determine all matters properly presented in relation thereto and will grant full relief. Switow v. Sher, 136 Fla. 284, 296, 186, South. Rep. 519, 524.

Any relief may be granted under a general prayer which is warranted by the case made by the pleadings and proof and not inconsistent with the relief specifically prayed for. Pinellas Packing Co. v. Clearwater Citrus Growers' Ass'n, 75 Fla. 247, 78 South. Rep. 16. The relief in the instant case would not have been full and complete without the granting of the injunction to appellees.

Appellants present several theories seeking to establish title to the controverted property in themselves.

The first theory is that this strip of land had been impliedly dedicated as a street or passage way, the public having been actually using it as such. The unrecorded plat of Maderia Beach Subdivision does not show any markings on the space representing the strip of land which would indicate an intention to dedicate the strip for any purpose.

In order to constitute a dedication there must be (1) an intention, on the part of the proprietor of the land, to dedicate the property to public use and (2) an acceptance by the public. The proof of both of these facts must be clear, satisfactory and unequivocal. City of Miami v. Florida East Coast Ry. Co., 79 Fla. 539, 84 South. Rep. 726; City of Palmetto v. Katsch, 86 Fla. 506; 98 South. Rep. 352. The mere user by the public, without the consent or objection of the owner, does not show an intention to dedicate. City of Palmetto v. Katsch, *supra*. In the instant case the record fails to show, by clear and satisfactory proof, any intent on the part of appellees to dedicate the land to public use. Therefore, it follows that this contention of appellants is without merit.

Appellants' second contention is that all of the appellees are estopped from seeking any affirmative relief due to the fraudulent misrepresentations of the appellee Archibald that the property was water front land. The chancellor, in his findings of fact, held that appellants had failed to prove the existence of any fraud. It is true that the testimony on this point is conflicting, but the Judge of the lower court had the opportunity to observe as well as hear the witnesses and his decree will not be reversed on findings of fact supported by the evidence unless it is made clearly to appear that such finding is erroneous. Schonfeld v. Engler, 119 Fla. 138, 160 South. Rep. 879; Boyte v. Stoer, 114 Fla. 395, 153 South. Rep. 845; Frickling Properties, Inc.,

v. Smith, 123 Fla. 556, 167 South. Rep. 42; Walter J. Dolan Properties, Inc., v. Vonnegut, 117 Fla. 830, 158 South. Rep. 457; Sabin v. City of Daytona, 130 Fla. 62, 177 South. Rep. 229; Nolen v. Nolen, 121 Fla. 130, 163 South. Rep. 401; Johns v. Gillian, 134 Fla. 575, 184 South. Rep. 140. There is ample evidence in the record to support the finding of the chancellor that there was no fraud in connection with the sale of the land to appellants.

The third contention of appellants is that they became vested with the title to the land in question by reason of a gradual erosion of the beach to such an extent that the ordinary or high water mark of the Gulf had reached a point east of appellants' westerly boundary line.

In disposing of this contention it will be necessary to determine exactly what is meant by *ordinary high water mark* or *ordinary high tide,* as it is essential that appellants show the ordinary high water mark or ordinary high tide of the Gulf of Mexico extended to their westerly boundary in order for them to be entitled to any sort of riparian rights, Martin v. Busch, 93 Fla. 535, 112 South. Rep. 274; Adams v. Elliott, 128 Fla. 79, 174 South. Rep. 731, and any claim of title to property due to erosion of tidal waters must be as strictly or even more strictly construed.

The determination of the exact meaning of "ordinary high water mark" has never been passed upon by this Court. However, in ascertaining just what were and were not tide lands in the State of Florida, this Court stated:

"Lands within the limits of the State of Florida that are *covered* and *uncovered* by the *ordinary daily* tides of public navigable waters are shore or tide lands, and the title to them is held by the State * * *

"* * * Overflowed lands are those that are covered by non-navigable waters * * * (not including lands between high and low water marks of navigable streams or bodies

of water, nor lands *covered* and *uncovered* by the *ordinary daily ebb* and *flow* of *normal tides* of navigable waters), * * *." (Emphasis added.) State *ex rel.* Ellis v. Gerbing, 56 Fla. 603, 615, 47 South. Rep. 343.

In arriving at the true meaning of the terms above designated it is appropriate to make a few comments on the tide and how it is influenced. At times of a new moon and full moon the tidal forces of moon and sun are acting in the same direction. High water then rises higher and low water falls lower than usual. The tides at such times are called "spring tides." When the moon is in its first and third quarters, the tidal forces of moon and sun are opposed and the tides do not rise so high nor fall so low. At such times the tides are called "neap tides."

The varying distance of the moon from the earth likewise affects the range of the tide. In its movement around the earth the moon describes an ellipse in a period of approximately 27½ days. When the moon is in perigee or nearest the earth, its tide-producing power is increased, resulting in an increased rise and fall of the tide. These tides are known as "perigean tides." When the moon is farthest from the earth, its tide-producing power is diminished, the tides at such time exhibiting a decreased rise and fall. These tides are called "apogean tides." Thus if a new or full moon is in perigee (High-spring or Equinoctial tide) the rise and fall of the tide will be greater than during the ordinary "spring tide." See Marmer's Tidal Datum Planes, U. S. Coast and Geodetic Survey, Department of Commerce, Pub. No. 135.

The term "ordinary high tide" does not refer to the limit which the monthly spring tides reach. The limit of the spring tides is, in one sense, the usual high-water mark, for as often as those tides occur, to that limit the flow extends; however, it is not the limit to which we refer

when we speak of "ordinary high-water mark" or "ordinary high tide." By the latter terms of phrases is meant the limit reached by the daily ebb and flow of the tide, the usual tide, or the neap tide that happens between the full and change of the moon. See State *ex rel.* Ellis v. Gerbing, *supra.* This meaning of ordinary high tide has the support of eminent authority. See Teschemacher v. Thompson, 18 Cal. 11, 79 Am. Dec. 151; Forgeus v. Santa Cruz County, 24 Cal. App. 193, 140 Pac. 1092; Taylor Sands Fishing Co. v. State Land Board, 36 Ore. 157, 108 Pac. 126; Cape Romain Land & Improvement Co. v. Georgia-Caroline Canning Co., 148 S. C. 428, 146 S. E. 434; Howard v. Ingersoll, 54 U. S. (8 How.) 381, 423, 14 L. Ed. 189; Thompson on Real Property, Vol. 4, Sec. 3220, p. 325; Gould on Waters (3d Ed.) Sec. 27, p. 61; Chapter VI, Hale's *De Jure Maris,* quoted in 16 Am. Rep. 60.

The evidence offered by appellants in support of their contention and that offered by appellees in refutation thereof is conflicting. The witnesses for appellants testified that they had seen the waters of the Gulf of Mexico up to and over the westerly boundary line of the Millers' property, while those of the appellees testified that the waters of the Gulf had not encroached upon the land of appellants at all. It is worthy of note, however, that several witnesses for appellants, testifying that they had seen the water up over the land of appellants and even up under the Millers' houses or cottages, admitted on cross-examination that their observations were made during a "spring tide or extremely high tide" and it was nowhere maintained that the usual or neap tide came up over the property of appellants in its every day ebb and flow.

The lower court in its final decree found that there had never been such erosion of the lands or that the waters of the Gulf had never encroached on appellants' land in such

a manner as to make them riparian owners. This was a question of fact, and appellants have failed to show that the findings of the court below in this respect are clearly erroneous.

For fourth contention the appellants argue that the unrecorded plat referred to in their first deed shows an obvious intention to lay out a subdivision along the open coast in such a manner as to make it attractive to people to purchase lots therein, and that the lot purchased at all times would have free access to the waters of the Gulf. The evidence in the record does not support this contention. There is nowhere in the record evidence to justify a finding of title to this controverted strip of land in the appellants.

In addition to the foregoing comments it might not be amiss for us to point out in conclusion that both instruments of conveyance in this case contained very exact, full, complete and definite descriptions of the premises. The first being according to a plat and the second by metes and bounds. Both of these instruments conveyed a piece of land whose bounds were determined. The disputed strip of land was not included in either conveyance and the appellants have shown no right to claim any right, title or interest in or to the premises.

We have carefully examined all other questions presented by appellants in their briefs; but, in view of our above conclusion, do not deem it necessary to discuss them at present.

The decree of the lower court is affirmed.

Affirmed.

WHITFIELD, P. J., and BROWN and CHAPMAN, J. J., concur.

Terrell, C. J., concurs in opinion and judgment.

Justices Buford and Thomas not participating as authorized by Section 4687, Compiled General Laws of 1927, and Rule 21-A of the Rules of this Court.