## TRUSTEES OF INTERNAL IMPROVEMENT FUND v. OCEAN HOTELS, Inc.

No. 73-360 CA(L)01.

Circuit Court, Fifteenth Judicial Circuit.

January 3, 1974.

Kenneth G. Oertel, Tallahassee, for the plaintiff.

Kenneth F. Hoffman, Assistant Attorney General, for Florida Department of Natural Resources.

Ellen S. Mills, Fort Lauderdale, for the defendant.

JAMES R. KNOTT, Circuit Judge.

*Final judgment:* This case presents the issue of fixing the mean high water line on an ocean beach which, through the natural processes of erosion and accretion, undergoes a predictable, seasonal loss and replenishment of approximately 90 feet of beach sand.

The beach area and upland property involved are located on Singer Island in the city of Riviera Beach. The portion of the beach above the mean high water line and the upland property are privately owned and leased by Ocean Hotels, Inc. (hereinafter referred to as "the company"), and contains the Hilton Inn of the Palm Beaches. The evidence shows that aside from seasonal variations, the beach has maintained a relatively stable configuration with the exception of a period between 1965 and 1968.

In September 1965 a ship named the *Amaryllis* was driven ashore somewhat to the south of the company's property, creating accre-

tion involving a substantial temporary buildup and widening of the beach area in front of the company's property. With the freighter's removal in 1968, the natural forces of wind and wave action began to erode this accreted sand, causing the beach to begin to revert to its prior state. Expert testimony indicated that as of June 6, 1973, the full process had not been completed and that further erosion could be expected before the beach would reach its pre-1965 configuration.

In 1970, while some of the accreted beach still remained in front of the property, the company, with the necessary permits, constructed a three-story addition to its hotel, running east to west with the easternmost portion directly fronting on the beach and the waters of the Atlantic Ocean. Situated so that it protrudes approximately 50 feet seaward of the historic vegetation line, it was constructed without the usual pilings, the use of which would evidently have obviated the necessity of the protective seawall which is the subject of controversy in this case. An engineer and witness for the company, Duncan E. Britt, commented on these facts in a letter dated February 18, 1972 —

> "We both know the real cause for installation of this protection barrier was that the designer of the building did not put the structure on piling. Apparently he was lulled into a false security by the existence of a beach extending approximately 200 feet east of the building line."

From the outset there was difficulty in protecting the front of the hotel wing. Initially a sandbag sill, or barrier, was installed to stop beach erosion and to prevent the wing from being undermined. But this was only temporarily successful. In 1972, continuing erosion and the resulting high tidal waters threatened to undermine the extension and cause its collapse. To meet the crisis, the company constructed a temporary, emergency cofferdam seawall approximately 26 feet in front (seaward) of the easternmost portion of the hotel wing. This structure was erected by driving vertical, interlocking sheets of steel piling into the rockbed beneath the beach. Thus, a U-shaped steel wall, extending several feet above the sandy beach, was built around the seaward end of the hotel extension.

While this metal, sand-filled barrier protects the stability of the front portion of the hotel wing to a large extent, it substantially inhibits the use of a previously unobstructed beach, so that people are unable to walk the beach in front of the hotel during a large part of the year. There is also evidence that the cofferdam seawall is now causing erosion to the southern littoral beaches, as had been anticipated by the company's engineer, Mr. Britt.

Prior to the completion of the seawall, the company was informed that its construction required a coastal construction permit from the Department of Natural Resources, and upon application a permit was granted for a temporary emergency cofferdam seawall. Subsequently, the company filed an application to make the cofferdam seawall permanent. This was considered by the Department of Natural Resources (Cabinet) on December 12, 1972, and again on January 3, 1973. At the latter meeting the company's application was denied and the department entered an order directing the company to remove the seawall. Thereafter the company instituted the present action to enjoin the enforcement of the department's order and the state of Florida initiated separate action to enjoin the company from maintaining its seawall on sovereign land. The cases were consolidated and came on regularly for trial before the court.

## I

At common law the title to all land under tidal waters below the mean high water line belonged to the crown. These waters and the land which they covered were held by the sovereign in trust for the use of all his subjects. The "trust doctrine" is now codified in Article X, §11 of the Florida Constitution, which specifies —

> "The title to lands . . . including beaches below the mean high water lines, is held by the state, by virtue of its sovereignty, in trust for all the people."

In further explanation of this concept, the Florida Supreme Court in Hayes v. Bowman, 91 So.2d 795, 799 (1957), has said —

> ". . . this title is held in trust . . . for purposes of navigation, fishing, bathing, and similar uses. Such title is not held primarily for purposes of sale or conversion into money. Basically it is trust property and should be devoted to the fulfillment of the purposes of that trust, to wit: the service of the people."

Thus, pursuant to the trust doctrine, the state safeguards a valuable yearround, natural recreational resource. Without dwelling on the subject, it may be noted that this is a resource which by common knowledge is being subjected to increasing demand and utilization as land development diminishes other available recreational areas. Furthermore, Florida's beaches are intimately related to, and have a profound impact upon, a large segment of the state's economy, so that the protection of this resource is of major importance. Placed in this framework, an accurate determination of the mean high water line, the boundary between the privately owned upland property and the beach area held in trust, obtains added significance.

In arriving at a definition of "mean high water line," the state argues that this court should adopt the definition formulated by Chief Justice Hughes in Borax Consolidated, Ltd. v. Los Angeles, 296 U. S. 10, 26 (1935) —

"In view of the definition of the *mean high tide,* as given by the United States Coast and Geodetic Survey, that 'mean high water at any place is the average height of all the high waters at that place over a considerable period of time,' and the further observation that 'from theoretical considerations of an astronomical character' there should be 'a periodic variation in the rise of water above sea level having a period of 18.6 years,' the Court of Appeals directed that in order to ascertain the mean high tide line with requisite certainty in fixing the boundary of valuable tidelands, such as those here in question appear to be, 'an average of 18.6 years should be determined as near as possible.' We find no error in that instruction.

". . . the mean high tide line . . . is neither the spring tide nor the neap tide, but a mean of all the high tides." (Emphasis supplied.)

In suggesting the federal definition over the Florida definition as stated in Miller v. Bay-to-Gulf, Inc., 193 So. 425 (1940), the state argues persuasively that the *Miller* case which formulated a definition of "ordinary high tide" as requiring an averaging of what the opinion termed "neap tides," as opposed to an averaging of *all* high tides, is based on a misconception of early common law principles. The state contends that the phrase "neap tide" actually means, even under Florida case law, ordinary tides, excluding only the extreme spring tides, and that if this view be taken, the difference between the Florida "neap tide" definition and the federal definition is negligible. As stated in the Miller case —

"At times of a new moon and full moon the tidal forces of moon and sun are acting in the same direction. High water then rises higher and low water falls lower than usual. The tides at such times are called 'spring tides.' When the moon is in its first and third quarters, the tidal forces of moon and sun are opposed and the tides do not rise so high nor fall so low. At such times the tides are called 'neap tides.'

"The varying distance of the moon from the earth likewise affects the range of the tide. In its movement around the earth the moon describes an ellipse in a period of approximately $27\frac{1}{2}$ days. When the moon is in perigee or nearest the earth, its tide-producing power is increased, resulting in an increased rise and fall of the tide. These tides are

known as 'perigean tides.' When the moon is farthest from the earth, its tide-producing power is diminished, the tides at such time exhibiting a decreased rise and fall. These tides are called 'apogean tides.' Thus if a new or full moon is in perigee (high-spring or equinoctial tide) the rise and fall of the tide will be greater than during the ordinary 'spring tide.' See Marmer's Tidal Datum Planes, U. S. Coast and Geodetic Survey, Department of Commerce, Pub. No. 135."

The state earnestly argues that there are inherent advantages in utilizing a definition which is already employed throughout most of the country, formulated by the Coast and Geodetic Survey. This has merit because the survey's published computations include all the high tides and these figures are in turn utilized and relied upon by surveyors. See *Fluctuating Shorelines and Tidal Boundaries: An Unresolved Problem,* 6 San Diego L. R. 447 (1969). These published computations lend themselves to easy reference when attempting to ascertain the vertical component requisite to boundary determinations. Nonetheless, while an appellate court may yet find the state's arguments compelling (but see People v. William Kent Estate Co., 51 Cal. Rptr. 215), this court is bound by the holding of the Florida Supreme Court in *Miller,* that —

"Ordinary high water mark or ordinary high tide . . . [means] the limit reached by the daily ebb and flow of the tide, the usual tide, or the neap tide that happens between the full and change of the moon."

Accordingly, in the case *sub judice,* this court specifically adopts the above definition of "ordinary high water mark" as the "mean high water line."

## II

The above definition, however, is only partially dispositive of the issue at hand. A second series of events must be evaluated before the mean high water line can be fixed with regard to the beach in question. In the late autumn and winter of each year, the beach in front of the company's property undergoes a predictable loss of width amounting to approximately 90 feet. Though this phenomenon occurs with seasonal regularity, its process is gradual and imperceptible, the result of a natural process of erosion. In the spring and summer months, the process reverses itself and natural accretion causes a replenishment of the beach. A twelve-month survey of the beach would thus show that there are two separate and distinct high water lines, the summer line being approximately 90 feet seaward of the winter line. This unique combination of circumstances places the case at hand in the category of one of first impression.

The state responds to the situation by suggesting that the court adopt a fluctuating, migrating boundary line. Essentially the state argues that because the high water line seasonally traverses the complete width of the beach, the boundary line between the private and public lands should be ambulatory, with the tideland subject to seasonal inundation being considered a "movable freehold," at one time being in the domain of the upland property owner and later shifting into the public domain. While this may have merit in that it comports with scientific fact, it is not acceptable as a property law concept. It is impractical in that it is too uncertain to be enforced. People v. William Kent Estate Co., 51 Cal. Rptr. 215 (1st D. C. A. 1966). It is contrary to all notions of specific boundary limitations and would engender more problems than it would resolve. In the present case, it would cause the cofferdam seawall to be on public lands for portions of the year and on private property during other parts of the year.

Having found the state's proposal unacceptable, three alternatives remain. The first is to accept the summer and most seaward mean high water line as the permanent boundary between the respective property owners. This would clearly be an invasion of the public trust; it would divest the people of the right to use and enjoy a large expanse of the beach for much of the year.

The second alternative is to adopt the mean of the two seasonal high water lines. While this appears at first glance to be an acceptable solution, it fails when subjected to the test of practical implementation. There are no figures which detail the exact extent and amount of beach erosion and accretion. If there were maps available showing the position of the shoreline at regular intervals during the year for a significant number of years, it might be possible to compare them and ascertain the extent of the movement as well as its frequency and duration; but maps presently available are derived from different sources and this inhibits their use for purposes of comparison. What would be needed to establish this fictional but stable boundary line is a series of maps on a monthly or even weekly basis for a long period of time. See *Fluctuating Shorelines and Tidal Boundaries: An Unresolved Problem,* supra. The time and expense required for such a project present virtually insurmountable barriers which preclude its practical application. There is the further consideration of how this alternative would affect the public's use of the beach. The evidence shows that the waves break against the seawall during the winter months. Thus if the boundary were situated between the two seasonal high water lines, for much of the year the tides would completely cover the public domain and would in fact extend over and cover a portion of the upland owner's property, i.e., during part of the year the public

land would be continuously submerged and unavailable for recreational use; the mean high water line would be landward of the boundary line, and the upland owner's property would be covered by the daily flux and reflux of the sea. In short, for a portion of the year there would be tideland on the Florida coast which contrary to the Florida Constitution would not be held by the state in trust for the people. For these reasons the court cannot adopt the mean of the two seasonal high water lines as the boundary.

Finally, there is the alternative of adopting the winter and most landward mean high water line as a permanent boundary between the public and private land. This solution fully recognizes and retains the *Miller* concept of the mean high water as determining tidal boundaries, fixing the line as it exists when seasonal erosion has had its maximum effect. Such a boundary would be characterized by permanence and stability, and would have the advantage of being readily ascertainable. The established vegetation line — which in the present case has been observed as a boundary by all other upland owners in the vicinity of the company's property — could serve as a convenient reference point. See Martin v. Busch, Fla., 112 So. 274 (1927). Both the state and the upland owner would know the exact nature and extent of their ownership and be free to utilize their lands in accordance with their respective interests; since the state holds its land in trust for the people, its use of the beach is more circumscribed than is the use of the upland property. This limitation redounds to the benefit and protection of the upland owner, for despite the fact that during times when the beach experiences maximum accretion he technically ceases to be a littoral owner, he nonetheless retains his exclusive right to access over his own property to the water, the right to make his water access available to the public in a commercial context and other prerogatives of a riparian owner. See Board of Trustees, etc. v. Medeira Beach Nominee, Inc., 272 So.2d 209 (2d Fla. App. 1973). Important in this solution is the public policy consideration that in the present case, unlike the situation in *Medeira Beach,* to adopt anything but the most landward mean high water line (or the unacceptable ambulatory line proposed by the state) would result in the "loss of public rights in the foreshore or beach which the public always has a right to use." *Id.,* at p. 213.

This court therefore concludes that the winter and most landward mean high water line must be selected as the boundary between the state and the upland owner. In so doing the court has had to balance the public policy favoring private littoral ownership against the public policy of holding the tideland in trust for the people, where the preservation of a vital public right is secured with but minimal effect upon the interests of the upland owner.

Other issues presented for the court's consideration require no extended discussion. The company urges that the substantial expense which may be required for the protection of its hotel extension in the absence of the present protruding cofferdam seawall should influence the court's decision, but where such a problem may be regarded as self-created, as here, there would appear to be little or no merit in that contention.

Wherefore, it is ordered and adjudged that the company, Ocean Hotels, Inc., forthwith remove its cofferdam seawall and that said company is enjoined from building or maintaining any structure seaward of the mean high water line as hereinabove defined. Costs to be taxed upon further order.