349 So.2d 788 (1977)
Elizabeth B. KRUSE, a/K/a Elizabeth Kruse Wandall, Appellant,
v.
GROKAP, INC., Appellee.
No. 76-1187.
District Court of Appeal of Florida, Second District.
September 2, 1977.
*789 Ezra J. Regen, Sarasota, for appellant.
Law Offices of Robert F. Thompson, Sarasota, for appellee.
GRIMES, Judge.
This case involves the application of the doctrine of submergence of tidal waters.
The parties were both record title holders of lots in Block 18 of Sarasota Beach Subdivision which is located on Siesta Key. Appellant was the owner of Lot 23. Appellee was the owner of Lot 10. The waters of the Gulf of Mexico originally laid along the southwest side of Lot 23. Lot 10 was located to the northeast of Lot 23 and separated therefrom by an alleyway.
The appellee brought a suit to quiet title to appellant's Lot 23 alleging that over a period of years the waters of the Gulf of Mexico gradually encroached upon Lot 23 and the alleyway to the extent that Lot 23 became completely submerged and disappeared beneath the waters of the Gulf. The complaint further alleged that the waters subsequently receded thus exposing what was formerly Lot 23 and that appellee is now the riparian owner of this land through accretion. The appellant filed an answer and a counterclaim specifically denying the allegations of submergence and accretion. Following a nonjury trial the court entered judgment quieting the title to Lot 23 in appellee.
There are two lines of authority in this country concerning the doctrine of submergence as related to gradual changes in the shoreline. Some jurisdictions hold that land lost through erosion or submergence is regained by the original owner when by reliction or accretion the water disappears and the land re-emerges.[1] On the other hand, many courts hold that once land is lost by erosion or submergence it is lost for good. If the water encroaches upon the land of a more remote owner and then changes its movement in the other direction gradually restoring the land which had been submerged, the re-emerging land becomes the property of the remote owner through the doctrine of accretion.[2] Florida has adopted the latter view.[3] But the threshold question is when is the land "lost" to submergence.
Private ownership of land in Florida bordering on navigable waters extends to the ordinary high water mark[4] or in the case of tidal waters to ordinary high tide.[5] The ordinary high water mark has been deemed synonymous with mean high tide.[6] Therefore, the issue in this case is whether the ordinary or mean high tide of the Gulf of Mexico had encroached upon appellee's Lot 10. If it did, appellant's title to Lot 23 was lost by submergence, and when the land later re-emerged, appellee became its owner by way of accretion. Thus, in ruling for appellee the trial court necessarily concluded that the ordinary high tide of the Gulf had reached Lot 10. We are compelled to reverse because as a matter of law there is insufficient evidence upon which such a conclusion can be based.
The variations which occur in major tide producing forces will go through one complete cycle in approximately 18.6 years.[7] *790 Apparently, this figure is often rounded out to nineteen years.[8] In Borax Consolidated Ltd. v. City of Los Angeles, supra, the court stated:
"In view of the definition of the mean high tide, as given by the United States Coast and Geodetic Survey, that `Mean high water at any place is the average height of all the high waters at that place over a considerable period of time,' and the further observation that `from theoretical considerations of an astronomical character' there should be `a periodic variation in the rise of water above sea level having a period of 18.6 years,' the Court of Appeals directed that in order to ascertain the mean high tide line with requisite certainty in fixing the boundary of valuable tidelands, such as those here in question appear to be, `an average of 18.6 years should be determined as near as possible.' We find no error in that instruction."
The significance of determining mean high water through observations covering a long period of time is explained in Norwood Gay's article, The High Water Mark: Boundary Between Public and Private Lands, at 18 U.Fla.L.Rev. 553, 556 (1965), where the author states:
"The definition of mean high water is simple enough: it is the average height of the high waters at a given place over a period of nineteen years....
* * * * * *
"A full tidal cycle is generally considered to be nineteen years, because during this period of time the more important of the tidal variations will have gone through complete cycles. Observations for lesser periods of time can be corrected to the nineteen-year cycle by comparison with a suitable tide station where nineteen-year values are available. In 1951 there were thirty primary tide stations located on the Atlantic coast, eight on the Gulf coast, fifteen on the Pacific coast, and eight in Alaska. The nineteen-year observations provided by these sixty-one stations for primary determination of mean sea level are sufficient because a satisfactory secondary determination of this datum plane can be made at all other places by using short period observations and correcting the results to a mean value by comparison with the data at one of the primary tide stations."
Thus it is that the boundary of ordinary or mean high tide exists in a particular location at any given time,[9] but in order to determine the location as of that time, it is necessary to average out the high tides over a nineteen-year period.[10] Since this is the duration of the full tidal cycle, it cannot fairly be said that a proper average has been determined by considering the tides over a lesser period of time. However, the location of mean high tide in a particular location can be made by using observations over a shorter period and correcting the results by comparison with the nineteen-year data of one of the primary tide stations maintained by the National Ocean *791 Survey (formerly the United States Coast and Geodetic Survey).[11]
None of this was done in the instant case. The only expert who testified was a surveyor whose observations concerning the mean high tide were properly stricken because they were based on some old photographs about which he had no knowledge. His testimony set forth below amply demonstrates that he did not follow a generally accepted method for determining mean high tide.
"Q Isn't it a fact, at the time this survey was made, the only real method of actually determining accurately the real mean high water line was the use of tide gauges?
A That was one.
Q That involved using those tide gauges over a considerable period of time at that time?
A That's right.
Q Do you remember approximately how long?
A You could go for one month, two months. There was an economic problem.
Q I'm talking about actually physically and completely locating the mean high water line. Theoretically, you had to go through a full 18.6 year cycle?
A Yes.
Q By computers, they have managed to shorten that?
A Yes.
Q Did you, in fact, use tide gauges to establish this mean high water line?
A No.
Q Did you take anybody else's tide gauge readings to establish it?
A No."
Presumably, the use of an expert would have been unnecessary if residents of the area could have testified that Lot 23 and the alleyway had been covered by the waters of the Gulf for at least nineteen years. Under these circumstances it would have necessarily followed that the boundary of mean high tide had moved upland of Lot 23. However, the longest period of time any witness testified that he observed the waters encroaching upon Lot 10 was for approximately five years. Therefore, there was no legally sufficient evidence upon which it could be said that mean high tide ever reached Lot 10. The appellee failed to carry its burden of proof and should have suffered an adverse judgment.
We do not conceive that we have established a new rule because we know of no reported decision specifying the length of time which must be considered in determining the mean high tide. If some trial courts have been applying a "reasonable time period", they must have done so simply because no one ever pointed out the generally accepted scientific principle that the extensive nature of tidal variations requires that ordinary high tide be measured with reference to a nineteen year period. Nevertheless, primarily because of Judge Scheb's apprehension, we have determined to certify this case to the Supreme Court as raising a question of great public interest.
REVERSED.
McNULTY, Acting C.J., concurs.
SCHEB, J., dissents with opinion.
SCHEB, Judge, dissenting.
I concur in the majority's observations that under Florida law: (1) an upland owner is divested of title to land which submerges through that gradual, natural process known as erosion; and (2) if that submerged land naturally and gradually reappears through the process of accretion, title is not regained by the former owner but rather is acquired by the owner of land which was riparian when the accretions formed.
In this case the evidence showed that Lot 23, owned by appellant, and the adjoining alleyway which separated it from Lot 10, *792 owned by appellee, were submerged into the Gulf of Mexico through the process of erosion. Witnesses testified that during the late 1940's and early 1950's Lot 23 was submerged for a period of three to five years and the Gulf tides penetrated into Lot 10. The evidence supports the implicit finding of the trial court that this tidal action resulted in establishment of a new mean high tide line across Lot 10 to which subsequent accretions of land attached.
The majority opinion by Judge Grimes is an excellent and well documented case for establishing a rule for determining mean high tide lines. Under the rule announced the mean or ordinary high water mark cannot be determined short of averaging the tides for the 18.6 years of the full tidal cycle. The rule makes sense, but I cannot find that trial courts have ever been directed to apply it in the past. Therefore, I cannot say the trial court committed error in failing to do so in this case.
In my opinion the trial judge followed the existing law of Florida; i.e., that a riparian owner possesses all land above the ordinary high tide or water mark and that this land may be added to or subtracted from by the processes known as accretion and erosion. Miller v. Bay-to-Gulf, Inc., 141 Fla. 452, 193 So. 425 (1940); Brickell v. Trammel, 77 Fla. 544, 82 So. 221 (1919); Mexico Beach Corp. v. St. Joe Paper Co., 97 So.2d 708 (Fla. 1st DCA 1957). None of these cases set forth the requirement that the property must be covered for a nineteen-year period in order to be deemed eroded as required by the majority.
Apparently convinced of the need to establish a definite rule to provide certainty in this area of the law, the majority announces the rule and then concludes that the evidence before the trial judge, which admittedly does not comport with the requirements of the announced rule, was legally insufficient to support the judgment rendered in favor of appellee.
As noted, there is considerable logic in establishment of the rule announced by the majority. However, stability in the law of real property frequently has depended more upon history than upon logic. In my opinion the trial judge followed the law of Florida as it existed at the time the case was tried. Even assuming arguendo the correctness of the majority's approach, to apply the rule the court today announces retrospectively will create uncertainty as to the legal significance of the shift in shorelines that occurred as a result of erosion and accretion in the 1940's and 1950's.
In my opinion there was competent, substantial evidence that the waters of the Gulf encroached upon Lot 10 for a sufficient period of time (here three to five years) to establish thereon a new mean high water mark; therefore, any land that accreted to Lot 10 subsequently should belong to appellee. On this basis I would affirm.
Despite the fact that the trial judge applied the law as generally understood by the Bench and Bar, I recognize the lingering question as to the period of time necessary for proof that formerly nonriparian lands have become riparian by the gradual approach of water and then subsequently increased in size by accretions.
I am gratified that notwithstanding the majority views this case differently than I, they have decided to certify the case to the Supreme Court as one of great public interest. In this certification, I concur; however, I respectfully dissent from the majority opinion.
NOTES
[1] E.g., Mikel v. Kerr, 499 F.2d 1178 (10th Cir.1974) applying Okl. law; Greeman v. Smith, 138 N.W.2d 433 (N.D. 1965).
[2] E.g., Winkle v. Mitrea, 195 Neb. 821, 241 N.W.2d 329 (1976); Younts v. Crockett, 238 Ark. 971, 385 S.W.2d 928 (1965); Grape v. Laiblin, 181 Kan. 677, 314 P.2d 335 (1957).
[3] Schulz v. City of Dania, 156 So.2d 520 (Fla. 2d DCA 1963). See Municipal Liquidators, Inc. v. Tench, 153 So.2d 728 (Fla. 2d DCA 1963); Mexico Beach Corporation v. St. Joe Paper Company, 97 So.2d 708 (Fla. 1st DCA 1957).
[4] Brickell v. Trammel, 77 Fla. 544, 82 So. 221 (1919).
[5] Miller v. Bay-to-Gulf, Inc., 141 Fla. 452, 193 So. 425 (1940).
[6] Borax Consolidated Ltd. v. City of Los Angeles, 296 U.S. 10, 56 S.Ct. 23, 80 L.Ed. 9 (1935).
[7] Maloney and Ausness, The Use and Legal Significance of the Mean High Water Line in Coastal Boundary Mapping, 53 U.N.C.L.Rev. 185, 196 (1974).
[8] The nineteen-year period for determining mean high water has recently been codified in the Florida Coastal Mapping Act of 1974. Thus, in the section dealing with definitions, Sec. 177.27(15), Fla. Stat. (1975), provides:

"(15) `Mean high water' means the average height of the high waters over a nineteen-year period. For shorter periods of observation, `mean high water' means the average height of the high waters after corrections are applied to eliminate known variations and to reduce the result to the equivalent of a mean nineteen-year value."
[9] The criteria used in locating the ordinary high water mark or mean high tide in Florida may be slightly different than in many jurisdictions because in Miller v. Bay-to-Gulf, Inc., supra, the court held that the ordinary high water mark was the limit reached by the neap tides rather than the line of the medium high tide between the spring tides and the neap tides. This decision has been criticized as being based upon an erroneous premise. Maloney and Ausness, supra, at 204; Gay, supra, at 561. In any event, this distinction does not affect our disposition of the instant case.
[10] See United States v. Pot-Nets, Inc., 363 F. Supp. 812 (D.Del. 1973); n. 7, supra.
[11] See Maloney and Ausness, supra, at 246 for a detailed discussion of the methodology.