(Slip Opinion)     OCTOBER TERM, 2009     1

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## STOP THE BEACH RENOURISHMENT, INC. *v.* FLORIDA DEPARTMENT OF ENVIRONMENTAL PROTECTION ET AL.

### CERTIORARI TO THE SUPREME COURT OF FLORIDA

No. 08–1151.   Argued December 2, 2009—Decided June 17, 2010

Florida owns in trust for the public the land permanently submerged beneath navigable waters and the foreshore. The mean high-water line is the ordinary boundary between private beachfront, or littoral property, and state-owned land. Littoral owners have, *inter alia,* rights to have access to the water, to use the water for certain purposes, to have an unobstructed view of the water, and to receive accretions and relictions (collectively, accretions) to the littoral property. An accretion occurs gradually and imperceptibly, while a sudden change is an avulsion. The littoral owner automatically takes title to dry land added to his property by accretion. With avulsion, however, the seaward boundary of littoral property remains what it was: the mean high-water line before the event. Thus, when an avulsion has added new land, the littoral owner has no right to subsequent accretions, because the property abutting the water belongs to the owner of the seabed (ordinarily the State).

Florida's Beach and Shore Preservation Act establishes procedures for depositing sand on eroded beaches (restoration) and maintaining the deposited sand (nourishment). When such a project is undertaken, the State entity that holds title to the seabed sets a fixed "erosion control line" to replace the fluctuating mean high-water line as the boundary between littoral and state property. Once the new line is recorded, the common law ceases to apply. Thereafter, when accretion moves the mean high-water line seaward, the littoral property remains bounded by the permanent erosion-control line.

Respondents the city of Destin and Walton County sought permits to restore 6.9 miles of beach eroded by several hurricanes, adding about 75 feet of dry sand seaward of the mean high-water line (to be

Syllabus

denominated the erosion-control line). Petitioner, a nonprofit corpo-
ration formed by owners of beachfront property bordering the project
(hereinafter Members) brought an unsuccessful administrative chal-
lenge. Respondent the Florida Department of Environmental Protec-
tion approved the permits, and this suit followed. The State Court of
Appeal concluded that the Department's order had eliminated the
Members' littoral rights (1) to receive accretions to their property and
(2) to have their property's contact with the water remain intact.
Concluding that this would be an unconstitutional taking and would
require an additional administrative requirement to be met, it set
aside the order, remanded the proceeding, and certified to the Florida
Supreme Court the question whether the Act unconstitutionally de-
prived the Members of littoral rights without just compensation. The
State Supreme Court answered "no" and quashed the remand, con-
cluding that the Members did not own the property supposedly
taken. Petitioner sought rehearing on the ground that the Florida
Supreme Court's decision effected a taking of the Members' littoral
rights contrary to the Fifth and Fourteenth Amendments; rehearing
was denied.

*Held:* The judgment is affirmed.

998 So. 2d 1102, affirmed.

 JUSTICE SCALIA delivered the opinion of the Court with respect to
Parts I, IV, and V, concluding that the Florida Supreme Court did not
take property without just compensation in violation of the Fifth and
Fourteenth Amendments. Pp. 24–29.

 (a) Respondents' arguments that petitioner does not own the prop-
erty and that the case is not ripe were not raised in the briefs in op-
position and thus are deemed waived. Pp. 24–25.

 (b) There can be no taking unless petitioner can show that, before
the Florida Supreme Court's decision, littoral property owners had
rights to future accretions and to contact with the water superior to
the State's right to fill in its submerged land. That showing cannot
be made. Two core Florida property-law principles intersect here.
First, the State as owner of the submerged land adjacent to littoral
property has the right to fill that land, so long as it does not interfere
with the rights of the public and of littoral landowners. Second, if an
avulsion exposes land seaward of littoral property that had previ-
ously been submerged, that land belongs to the State even if it inter-
rupts the littoral owner's contact with the water. Prior Florida law
suggests that there is no exception to this rule when the State causes
the avulsion. Thus, Florida law as it stood before the decision below
allowed the State to fill in its own seabed, and the resulting sudden
exposure of previously submerged land was treated like an avulsion
for ownership purposes. The right to accretions was therefore subor-

dinate to the State's right to fill. Pp. 25–27.

 (c) The decision below is consistent with these principles. Cf. *Lucas* v. *South Carolina Coastal Council*, 505 U. S. 1003, 1028–1029. It did not abolish the Members' right to future accretions, but merely held that the right was not implicated by the beach-restoration project because of the doctrine of avulsion. Relying on dicta in the Florida Supreme Court's *Sand Key* decision, petitioner contends that the State took the Members' littoral right to have the boundary always be the mean high-water line. But petitioner's interpretation of that dictum contradicts the clear law governing avulsion. One cannot say the Florida Supreme Court contravened established property law by rejecting it. Pp. 27–29.

 JUSTICE SCALIA, joined by THE CHIEF JUSTICE, JUSTICE THOMAS, and JUSTICE ALITO, concluded in Parts II and III that if a court declares that what was once an established right of private property no longer exists, it has taken that property in violation of the Takings Clause. Pp. 7–24.

 (a) Though the classic taking is a transfer of property by eminent domain, the Clause applies to other state actions that achieve the same thing, including those that recharacterize as public property what was previously private property, see *Webb's Fabulous Pharmacies, Inc.* v. *Beckwith*, 449 U. S. 155, 163–165. The Clause is not addressed to the action of a specific branch or branches. It is concerned simply with the act, not with the governmental actor. This Court's precedents provide no support for the proposition that takings effected by the judicial branch are entitled to special treatment, and in fact suggest the contrary. See *PruneYard Shopping Center* v. *Robins,* 447 U. S. 74, *Webb's Fabulous Pharmacies*, *supra.* Pp. 7–20.

 (b) For a judicial taking, respondents would add to the normal takings inquiry the requirement that the court's decision have no "fair and substantial basis." This test is not obviously appropriate, but it is no different in this context from the requirement that the property owner prove an established property right. Respondents' additional arguments—that federal courts lack the knowledge of state law required to decide whether a state judicial decision purporting to clarify property rights has instead taken them; that common-law judging should not be deprived of needed flexibility; and that applying the Takings Clause to judicial decisions would force lower federal courts to review final state-court judgments, in violation of the *Rooker-Feldman* doctrine, see *Rooker* v. *Fidelity Trust Co.*, 263 U. S. 413, 415–416, *District of Columbia Court of Appeals* v. *Feldman*, 460 U. S. 462, 476—are unpersuasive. And petitioner's proposed "unpredictability test"—that a judicial taking consists of a decision that "constitutes a sudden change in state law, unpredictable in terms of rele-

vant precedents," *Hughes* v. *Washington*, 389 U. S. 290, 296 (Stewart, J., concurring)—is misdirected. What counts is not whether there is precedent for the allegedly confiscatory decision, but whether the property right allegedly taken was well established. Pp. 20–24.

JUSTICE KENNEDY, joined by JUSTICE SOTOMAYOR, agreed that the Florida Supreme Court did not take property without just compensation, but concluded that this case does not require the Court to determine whether, or when, a judicial decision determining property owners' rights can violate the Takings Clause. If and when future cases show that the usual principles, including constitutional ones that constrain the judiciary like due process, are inadequate to protect property owners, then the question whether a judicial decision can effect a taking would be properly presented. Pp. 1–10.

JUSTICE BREYER, joined by JUSTICE GINSBURG, agreed that no unconstitutional taking occurred here, but concluded that it is unnecessary to decide more than that to resolve this case. Difficult questions of constitutional law—*e.g.,* whether federal courts may review a state court's decision to determine if it unconstitutionally takes private property without compensation, and what the proper test is for evaluating whether a state-court property decision enacts an unconstitutional taking—need not be addressed in order to dispose "of the immediate case." *Whitehouse* v. *Illinois Central R. Co.*, 349 U. S. 366, 373. Such questions are better left for another day. Pp. 1–3.

SCALIA, J., announced the judgment of the Court and delivered the opinion of the Court with respect to Parts I, IV, and V, in which ROBERTS, C. J., and KENNEDY, THOMAS, GINSBURG, BREYER, ALITO, and SOTOMAYOR, JJ., joined, and an opinion with respect to Parts II and III, in which ROBERTS, C. J., and THOMAS and ALITO, JJ., joined. KENNEDY, J., filed an opinion concurring in part and concurring in the judgment, in which SOTOMAYOR, J., joined. BREYER, J., filed an opinion concurring in part and concurring in the judgment, in which GINSBURG, J., joined. STEVENS, J., took no part in the decision of the case.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

No. 08–1151

## STOP THE BEACH RENOURISHMENT, INC., PETITIONER *v.* FLORIDA DEPARTMENT OF ENVIRONMENTAL PROTECTION ET AL.

### ON WRIT OF CERTIORARI TO THE SUPREME COURT OF FLORIDA

[June 17, 2010]

JUSTICE SCALIA announced the judgment of the Court and delivered the opinion of the Court with respect to Parts I, IV, and V, and an opinion with respect to Parts II and III, in which THE CHIEF JUSTICE, JUSTICE THOMAS, and JUSTICE ALITO join.

We consider a claim that the decision of a State's court of last resort took property without just compensation in violation of the Takings Clause of the Fifth Amendment, as applied against the States through the Fourteenth, see *Dolan* v. *City of Tigard*, 512 U. S. 374, 383–384 (1994).

## I
### A

Generally speaking, state law defines property interests, *Phillips* v. *Washington Legal Foundation*, 524 U. S. 156, 164 (1998), including property rights in navigable waters and the lands underneath them, see *United States* v. *Cress*, 243 U. S. 316, 319–320 (1917); *St. Anthony Falls Water Power Co.* v. *St. Paul Water Comm'rs*, 168 U. S. 349, 358–359 (1897). In Florida, the State owns in trust for the

public the land permanently submerged beneath naviga-
ble waters and the foreshore (the land between the low-
tide line and the mean high-water line).   Fla. Const.,
Art. X, §11; *Broward* v. *Mabry*, 58 Fla. 398, 407–409, 50
So. 826, 829–830 (1909).   Thus, the mean high-water line
(the average reach of high tide over the preceding 19
years) is the ordinary boundary between private beach-
front, or littoral[1] property, and state-owned land.   See
*Miller* v. *Bay-To-Gulf, Inc.*, 141 Fla. 452, 458–460, 193 So.
425, 427–428 (1940) *(per curiam);* Fla. Stat. §§177.27(14)–
(15), 177.28(1) (2007).

   Littoral owners have, in addition to the rights of the
public, certain "special rights" with regard to the water
and the foreshore, *Broward*, 58 Fla., at 410, 50 So., at 830,
rights which Florida considers to be property, generally
akin to easements, see *ibid.; Thiesen* v. *Gulf, Florida &
Alabama R. Co.,* 75 Fla. 28, 57, 78, 78 So. 491, 500, 507
(1918) (on rehearing).   These include the right of access to
the water, the right to use the water for certain purposes,
the right to an unobstructed view of the water, and the
right to receive accretions and relictions to the littoral
property.   *Id.,* at  58–59, 78 So., at 501; *Board of Trustees
of Internal Improvement Trust Fund* v. *Sand Key Assoc.,
Ltd.*, 512 So. 2d 934, 936 (Fla. 1987).   This is generally in
accord with well-established common law, although the
precise property rights vary among jurisdictions.   Com-
pare *Broward, supra*, at 409–410, 50 So., at 830, with 1 J.
Lewis, Law of Eminent Domain §100 (3d ed. 1909); 1 H.
Farnham, Law of Waters and Water Rights §62, pp. 278–

---

[1] Many cases and statutes use "riparian" to mean abutting any body
of water.  The Florida Supreme Court, however, has adopted a more
precise usage whereby "riparian" means abutting a river or stream and
"littoral" means abutting an ocean, sea, or lake. *Walton Cty.* v. *Stop the
Beach Renourishment, Inc.*, 998 So. 2d 1102, 1105, n. 3 (2008).  When
speaking of the Florida law applicable to this case, we follow the
Florida Supreme Court's terminology.

280 (1904) (hereinafter Farnham).

At the center of this case is the right to accretions and relictions. Accretions are additions of alluvion (sand, sediment, or other deposits) to waterfront land; relictions are lands once covered by water that become dry when the water recedes. F. Maloney, S. Plager, & F. Baldwin, Water Law and Administration: The Florida Experience §126, pp. 385–386 (1968) (hereinafter Maloney); 1 Farnham §69, at 320. (For simplicity's sake, we shall refer to accretions and relictions collectively as accretions, and the process whereby they occur as accretion.) In order for an addition to dry land to qualify as an accretion, it must have occurred gradually and imperceptibly—that is, so slowly that one could not see the change occurring, though over time the difference became apparent. *Sand Key*, *supra*, at 936; *County of St. Clair* v. *Lovingston*, 23 Wall. 46, 66–67 (1874). When, on the other hand, there is a "sudden or perceptible loss of or addition to land by the action of the water or a sudden change in the bed of a lake or the course of a stream," the change is called an avulsion. *Sand Key*, *supra*, at 936; see also 1 Farnham §69, at 320.

In Florida, as at common law, the littoral owner automatically takes title to dry land added to his property by accretion; but formerly submerged land that has become dry land by avulsion continues to belong to the owner of the seabed (usually the State). See, *e.g., Sand Key*, *supra*, at 937; Maloney §126.6, at 392; 2 W. Blackstone, Commentaries on the Laws of England 261–262 (1766) (hereinafter Blackstone). Thus, regardless of whether an avulsive event exposes land previously submerged or submerges land previously exposed, the boundary between littoral property and sovereign land does not change; it remains (ordinarily) what was the mean high-water line before the event. See *Bryant* v. *Peppe*, 238 So. 2d 836, 838–839 (Fla. 1970); J. Gould, Law of Waters §158, p. 290 (1883). It follows from this that, when a new strip of land has been

added to the shore by avulsion, the littoral owner has no right to subsequent accretions. Those accretions no longer add to *his* property, since the property abutting the water belongs not to him but to the State. See Maloney §126.6, at 393; 1 Farnham §71a, at 328.

B

In 1961, Florida's Legislature passed the Beach and Shore Preservation Act, 1961 Fla. Laws ch. 61–246, as amended, Fla. Stat. §§161.011–161.45 (2007). The Act establishes procedures for "beach restoration and nourishment projects," §161.088, designed to deposit sand on eroded beaches (restoration) and to maintain the deposited sand (nourishment). §§161.021(3), (4). A local government may apply to the Department of Environmental Protection for the funds and the necessary permits to restore a beach, see §§161.101(1), 161.041(1). When the project involves placing fill on the State's submerged lands, authorization is required from the Board of Trustees of the Internal Improvement Trust Fund, see §253.77(1), which holds title to those lands, §253.12(1).

Once a beach restoration "is determined to be undertaken," the Board sets what is called "an erosion control line." §§161.161(3)–(5). It must be set by reference to the existing mean high-water line, though in theory it can be located seaward or landward of that.[2] See §161.161(5). Much of the project work occurs seaward of the erosion-control line, as sand is dumped on what was once submerged land. See App. 87–88. The fixed erosion-control line replaces the fluctuating mean high-water line as the

---

[2] We assume, as the parties agree we should, that in this case the erosion-control line is the pre-existing mean high-water line. Tr. of Oral Arg. 11–12. Respondents concede that, if the erosion-control line were established landward of that, the State would have taken property. Brief for Respondent Department et al. 15; Brief for Respondent Walton County et al. 6.

boundary between privately owned littoral property and state property. §161.191(1). Once the erosion-control line is recorded, the common law ceases to increase upland property by accretion (or decrease it by erosion). §161.191(2). Thus, when accretion to the shore moves the mean high-water line seaward, the property of beachfront landowners is not extended to that line (as the prior law provided), but remains bounded by the permanent erosion-control line. Those landowners "continue to be entitled," however, "to all common-law riparian rights" other than the right to accretions. §161.201. If the beach erodes back landward of the erosion-control line over a substantial portion of the shoreline covered by the project, the Board may, on its own initiative, or must, if asked by the owners or lessees of a majority of the property affected, direct the agency responsible for maintaining the beach to return the beach to the condition contemplated by the project. If that is not done within a year, the project is canceled and the erosion-control line is null and void. §161.211(2), (3). Finally, by regulation, if the use of submerged land would "unreasonably infringe on riparian rights," the project cannot proceed unless the local governments show that they own or have a property interest in the upland property adjacent to the project site. Fla. Admin. Code Rule 18–21.004(3)(b) (2009).

C

In 2003, the city of Destin and Walton County applied for the necessary permits to restore 6.9 miles of beach within their jurisdictions that had been eroded by several hurricanes. The project envisioned depositing along that shore sand dredged from further out. See *Walton Cty.* v. *Stop the Beach Renourishment, Inc.*, 998 So. 2d 1102, 1106 (Fla. 2008). It would add about 75 feet of dry sand seaward of the mean high-water line (to be denominated the erosion-control line). The Department issued a notice of

intent to award the permits, App. 27–41, and the Board approved the erosion-control line, *id.*, at 49–50.

The petitioner here, Stop the Beach Renourishment, Inc., is a nonprofit corporation formed by people who own beachfront property bordering the project area (we shall refer to them as the Members). It brought an administrative challenge to the proposed project, see *id.*, at 10–26, which was unsuccessful; the Department approved the permits. Petitioner then challenged that action in state court under the Florida Administrative Procedure Act, Fla. Stat. §120.68 (2007). The District Court of Appeal for the First District concluded that, contrary to the Act's preservation of "all common-law riparian rights," the order had eliminated two of the Members' littoral rights: (1) the right to receive accretions to their property; and (2) the right to have the contact of their property with the water remain intact. *Save Our Beaches, Inc.* v. *Florida Dept. of Environmental Protection*, 27 So. 3d 48, 57 (2006). This, it believed, would be an unconstitutional taking, which would "unreasonably infringe on riparian rights," and therefore require the showing under Fla. Admin. Code Rule 18–21.004(3)(b) that the local governments owned or had a property interest in the upland property. It set aside the Department's final order approving the permits and remanded for that showing to be made. 27 So. 3d, at 60. It also certified to the Florida Supreme Court the following question (as rephrased by the latter court):

> "On its face, does the Beach and Shore Preservation Act unconstitutionally deprive upland owners of littoral rights without just compensation?"[3]  998 So. 2d, at 1105 (footnotes omitted).

———————

[3] The Florida Supreme Court seemingly took the question to refer to constitutionality under the Florida Constitution, which contains a clause similar to the Takings Clause of the Federal Constitution. Compare Fla. Const., Art. X, §6, cl. (a), with U. S. Const., Amdt. 5.

The Florida Supreme Court answered the certified question in the negative, and quashed the First District's remand. *Id.*, at 1121. It faulted the Court of Appeal for not considering the doctrine of avulsion, which it concluded permitted the State to reclaim the restored beach on behalf of the public. *Id.,* at 1116–1118. It described the right to accretions as a future contingent interest, not a vested property right, and held that there is no littoral right to contact with the water independent of the littoral right of access, which the Act does not infringe. *Id.,* at 1112, 1119–1120. Petitioner sought rehearing on the ground that the Florida Supreme Court's decision itself effected a taking of the Members' littoral rights contrary to the Fifth and Fourteenth Amendments to the Federal Constitution.[4] The request for rehearing was denied. We granted certiorari, 557 U. S. \_\_\_ (2009).

## II

### A

Before coming to the parties' arguments in the present case, we discuss some general principles of our takings jurisprudence. The Takings Clause—"nor shall private property be taken for public use, without just compensation," U. S. Const., Amdt. 5—applies as fully to the taking of a landowner's riparian rights as it does to the taking of an estate in land.[5] See *Yates* v. *Milwaukee*, 10 Wall. 497, 504 (1871). Moreover, though the classic taking is a trans-

---

[4] We ordinarily do not consider an issue first presented to a state court in a petition for rehearing if the state court did not address it. See *Adams* v. *Robertson*, 520 U. S. 83, 89, n. 3 (1997) *(per curiam)*. But where the state-court decision itself is claimed to constitute a violation of federal law, the state court's refusal to address that claim put forward in a petition for rehearing will not bar our review. See *Brinker-hoff-Faris Trust & Sav. Co.* v. *Hill*, 281 U. S. 673, 677–678 (1930).

[5] We thus need not resolve whether the right of accretion is an easement, as petitioner claims, or, as Florida claims, a contingent future interest.

fer of property to the State or to another private party by
eminent domain, the Takings Clause applies to other state
actions that achieve the same thing. Thus, when the
government uses its own property in such a way that it
destroys private property, it has taken that property. See
*United States* v. *Causby*, 328 U. S. 256, 261–262 (1946);
*Pumpelly* v. *Green Bay Co.*, 13 Wall. 166, 177–178 (1872).
Similarly, our doctrine of regulatory takings "aims to
identify regulatory actions that are functionally equivalent
to the classic taking." *Lingle* v. *Chevron U. S. A. Inc.*, 544
U. S. 528, 539 (2005). Thus, it is a taking when a state
regulation forces a property owner to submit to a perma-
nent physical occupation, *Loretto* v. *Teleprompter Manhat-
tan CATV Corp.*, 458 U. S. 419, 425–426 (1982), or de-
prives him of all economically beneficial use of his
property, *Lucas* v. *South Carolina Coastal Council*, 505
U. S. 1003, 1019 (1992). Finally (and here we approach
the situation before us), States effect a taking if they
recharacterize as public property what was previously
private property. See *Webb's Fabulous Pharmacies, Inc.* v.
*Beckwith*, 449 U. S. 155, 163–165 (1980).

The Takings Clause (unlike, for instance, the Ex Post
Facto Clauses, see Art. I, §9, cl. 3; §10, cl. 1) is not ad-
dressed to the action of a specific branch or branches. It is
concerned simply with the act, and not with the govern-
mental actor ("nor shall private property *be taken*" (em-
phasis added)). There is no textual justification for saying
that the existence or the scope of a State's power to expro-
priate private property without just compensation varies
according to the branch of government effecting the expro-
priation. Nor does common sense recommend such a
principle. It would be absurd to allow a State to do by
judicial decree what the Takings Clause forbids it to do by
legislative fiat. See *Stevens* v. *Cannon Beach*, 510 U. S.
1207, 1211–1212 (1994) (SCALIA, J., dissenting from denial
of certiorari).

Our precedents provide no support for the proposition that takings effected by the judicial branch are entitled to special treatment, and in fact suggest the contrary. *PruneYard Shopping Center* v. *Robins,* 447 U. S. 74 (1980), involved a decision of the California Supreme Court overruling one of its prior decisions which had held that the California Constitution's guarantees of freedom of speech and of the press, and of the right to petition the government, did not require the owner of private property to accord those rights on his premises. The appellants, owners of a shopping center, contended that their private property rights could not "be denied by invocation of a state constitutional provision *or by judicial reconstruction of a State's laws of private property,*" *id.*, at 79 (emphasis added). We held that there had been no taking, citing cases involving legislative and executive takings, and applying standard Takings Clause analysis. See *id.,* at 82–84. We treated the California Supreme Court's application of the constitutional provisions as a regulation of the use of private property, and evaluated whether that regulation violated the property owners' "right to exclude others," *id.,* at 80 (internal quotation marks omitted). Our opinion addressed only the claimed taking by the constitutional provision. Its failure to speak separately to the claimed taking by "judicial reconstruction of a State's laws of private property" certainly does not suggest that a taking by judicial action cannot occur, and arguably suggests that the same analysis applicable to taking by constitutional provision would apply.

*Webb's Fabulous Pharmacies, supra*, is even closer in point. There the purchaser of an insolvent corporation had interpleaded the corporation's creditors, placing the purchase price in an interest-bearing account in the registry of the Circuit Court of Seminole County, to be distributed in satisfaction of claims approved by a receiver. The Florida Supreme Court construed an applicable statute to

mean that the interest on the account belonged to the county, because the account was "considered 'public money,'" *Beckwith* v. *Webb's Fabulous Pharmacies*, 374 So. 2d 951, 952–953 (1979) *(per curiam)*. We held this to be a taking. We noted that "[t]he usual and general rule is that any interest on an interpleaded and deposited fund follows the principal and is to be allocated to those who are ultimately to be the owners of that principal," 449 U. S., at 162. "Neither the Florida Legislature by statute, nor the Florida courts by judicial decree," we said, "may accomplish the result the county seeks simply by recharacterizing the principal as 'public money.'" *Id.,* at 164.

In sum, the Takings Clause bars *the State* from taking private property without paying for it, no matter which branch is the instrument of the taking. To be sure, the manner of state action may matter: Condemnation by eminent domain, for example, is always a taking, while a legislative, executive, or judicial restriction of property use may or may not be, depending on its nature and extent. But the particular state *actor* is irrelevant. If a legislature *or a court* declares that what was once an established right of private property no longer exists, it has taken that property, no less than if the State had physically appropriated it or destroyed its value by regulation. "[A] State, by *ipse dixit*, may not transform private property into public property without compensation." *Ibid.*

B

JUSTICE BREYER's concurrence says that we need neither (1) to decide whether the judiciary can ever effect a taking, nor (2) to establish the standard for determining whether it has done so. See *post*, at 1–2 (opinion concurring in part and concurring in judgment). The second part of this is surely incompatible with JUSTICE BREYER's conclusion that the "Florida Supreme Court's decision in this case did not amount to a 'judicial taking.'" *Post*, at 3.

One cannot know whether a takings claim is invalid without knowing what standard it has failed to meet.[6]  Which means that JUSTICE BREYER must either (a) grapple with the artificial question of what would constitute a judicial taking if there were such a thing as a judicial taking (reminiscent of the perplexing question how much wood would a woodchuck chuck if a woodchuck could chuck wood?), or (b) answer in the negative what he considers to be the "unnecessary" constitutional question whether there is such a thing as a judicial taking.

It is not true that deciding the constitutional question in this case contradicts our settled practice.  To the contrary, we have often recognized the existence of a constitutional right, or established the test for violation of such a right (or both), and then gone on to find that the claim at issue fails.  See, *e.g., New Jersey* v. *T. L. O.*, 469 U. S. 325, 333, 341–343 (1985) (holding that the Fourth Amendment applies to searches and seizures conducted by public-school officials, establishing the standard for finding a violation, but concluding that the claim at issue failed); *Strickland* v. *Washington*, 466 U. S. 668, 687, 698–700 (1984) (recognizing a constitutional right to effective assistance of counsel, establishing the test for its violation, but holding that the claim at issue failed); *Hill* v. *Lockhart*, 474 U. S. 52, 58–60 (1985) (holding that a *Strickland* claim can be brought to challenge a guilty plea, but rejecting the claim at issue); *Jackson* v. *Virginia*, 443 U. S. 307, 313–320, 326 (1979) (recognizing a due process claim based on insufficiency of evidence, establishing the governing test, but concluding that the claim at issue failed); *Village of Euclid* v. *Ambler Realty Co.*, 272 U. S. 365, 390,

—————

[6]Thus, the landmark case of *Penn Central Trans. Co.* v. *New York,* 438 U. S. 104, 124–128, 138 (1978), held that there was no taking only after setting forth a multi-factor test for determining whether a regulation restricting the use of property effects a taking.

395–397 (1926) (recognizing that block zoning ordinances could constitute a taking, but holding that the challenged ordinance did not do so); *Chicago, B. & Q. R. Co.* v. *Chicago*, 166 U. S. 226, 241, 255–257 (1897) (holding that the Due Process Clause of the Fourteenth Amendment prohibits uncompensated takings, but concluding that the court below made no errors of law in assessing just compensation). In constitutional-tort suits against public officials, we have found the defendants entitled to immunity only after holding that their action violated the Constitution. See, *e.g., Wilson* v. *Layne*, 526 U. S. 603, 605–606 (1999). Indeed, up until last Term, we *required* federal courts to address the constitutional question before the immunity question. See *Saucier* v. *Katz*, 533 U. S. 194, 201 (2001), overruled by *Pearson* v. *Callahan*, 555 U. S. ___, ___ (2009) (slip op., at 10).

"Assuming without deciding" would be less appropriate here than it was in many of those earlier cases, which established constitutional rights quite separate from any that had previously been acknowledged. Compared to *Strickland*'s proclamation of a right to effective assistance of counsel, for example, proclaiming that a taking can occur through judicial action addresses a point of relative detail.

In sum, JUSTICE BREYER cannot decide that petitioner's claim fails without first deciding what a valid claim would consist of. His agreement with Part IV of our opinion necessarily implies agreement with the test for a judicial taking (elaborated in Part II–A) which Part IV applies: whether the state court has "declare[d] that what was once an established right of private property no longer exists," *supra*, at 10. JUSTICE BREYER must either agree with that standard or craft one of his own. And agreeing to or crafting a *hypothetical* standard for a *hypothetical* constitutional right is sufficiently unappealing (we have eschewed that course many times in the past) that

JUSTICE BREYER might as well acknowledge the right as well. Or he could avoid the need to agree with or craft a hypothetical standard by *denying* the right. But embracing a standard while being coy about the right is, well, odd; and deciding this case while addressing *neither* the standard *nor* the right is quite impossible.

JUSTICE BREYER responds that he simply advocates resolving this case without establishing "*the precise* standard under which a party wins or loses." *Post*, at 3 (emphasis added). But he relies upon no standard at all, precise or imprecise. He simply pronounces that this is not a judicial taking if there is such a thing as a judicial taking. The cases he cites to support this Queen-of-Hearts approach provide no precedent. In each of them the existence of the right in question was settled,[7] and we faced a choice between *competing* standards that had been applied by the courts.[8] We simply held that the right in question had not been infringed under *any* of them. There is no established right here, and no competing standards.

---

[7] See *Smith* v. *Spisak*, 558 U. S. \_\_\_, \_\_\_ (2010) (slip op., at 9–16) (ineffective assistance of counsel); *Quilloin* v. *Walcott*, 434 U. S. 246, 255 (1978) (equal protection); *Mercer* v. *Theriot*, 377 U. S. 152, 155 (1964) *(per curiam)* (right to judgment notwithstanding the verdict where evidence is lacking).

[8] See *Spisak, supra*, at \_\_\_ (slip op., at 16). *Quilloin*'s cryptic rejection of the claim "[u]nder any standard of review," 434 U. S., at 256, could only refer to the various levels of scrutiny—such as "strict" or "rational basis"—that we had applied to equal-protection claims, see *Loving* v. *Virginia*, 388 U. S. 1, 8–9 (1967). And in *Mercer*, which found the evidence "sufficient under any standard which might be appropriate—state or federal," 377 U. S., at 156, one of the parties had argued for an established standard under Louisiana law, and the other for an established federal standard. Compare Brief for Petitioner in *Mercer* v. *Theriot*, O. T. 1963, No. 336, pp. 18–22, with Brief for Respondent in *Mercer* v. *Theriot*, p. 5.

C

Like JUSTICE BREYER's concurrence, JUSTICE KENNEDY's concludes that the Florida Supreme Court's action here does not meet the standard for a judicial taking, while purporting not to determine what is the standard for a judicial taking, or indeed whether such a thing as a judicial taking even exists. That approach is invalid for the reasons we have discussed.

JUSTICE KENNEDY says that we need not take what he considers the bold and risky step of holding that the Takings Clause applies to judicial action, because the Due Process Clause "would likely prevent a State from doing by judicial decree what the Takings Clause forbids it to do by legislative fiat," *post*, at 4–5 (opinion concurring in part and concurring in judgment) (internal quotation marks omitted). He invokes the Due Process Clause "in both its substantive and procedural aspects," *post,* at 3, not specifying which of his arguments relates to which.

The first respect in which JUSTICE KENNEDY thinks the Due Process Clause can do the job seems to sound in Procedural Due Process. Because, he says, "[c]ourts, unlike the executive or legislature, are not designed to make policy decisions" about expropriation, "[t]he Court would be on strong footing in ruling that a judicial decision that eliminates or substantially changes established property rights" violates the Due Process Clause. *Post*, at 4. Let us be clear what is being proposed here. This Court has held that the separation-of-powers principles that the Constitution imposes upon the Federal Government do not apply against the States. See *Dreyer* v. *Illinois*, 187 U. S. 71, 83–84 (1902). But in order to avoid the bold and risky step of saying that the Takings Clause applies to *all* government takings, JUSTICE KENNEDY would have us use Procedural Due Process to impose judicially crafted separation-of-powers limitations upon the States: courts cannot be used to perform the governmental function of ex-

propriation. The asserted reasons for the due-process limitation are that the legislative and executive branches "are accountable in their political capacity" for takings, *post*, at 2, and "[c]ourts . . . are not designed to make policy decisions" about takings, *post,* at 4. These reasons may have a lot to do with sound separation-of-powers principles that ought to govern a democratic society, but they have nothing whatever to do with the protection of individual rights that is the object of the Due Process Clause.

Of course even taking those reasons at face value, it is strange to proclaim a democracy deficit and lack of special competence for the judicial taking of an individual property right, when this Court has had no trouble deciding matters of much greater moment, contrary to congressional desire or the legislated desires of most of the States, with no special competence except the authority we possess to enforce the Constitution. In any case, our opinion does *not* trust judges with the relatively small power JUSTICE KENNEDY now objects to. It is we who propose setting aside judicial decisions that take private property; it is he who insists that judges cannot be so limited. Under his regime, the citizen whose property has been judicially redefined to belong to the State would presumably be given the Orwellian explanation: "The court did not take your property. Because it is neither politically accountable nor competent to make such a decision, it cannot take property."

JUSTICE KENNEDY's injection of separation-of-powers principles into the Due Process Clause would also have the ironic effect of preventing the assignment of the expropriation function to the branch of government whose procedures are, by far, the *most* protective of individual rights. So perhaps even this first respect in which JUSTICE KENNEDY would have the Due Process Clause do the work of the Takings Clause pertains to Substantive, rather than Procedural, Due Process. His other arguments undoubt-

edly pertain to that, as evidenced by his assertion that "[i]t is . . . natural to read the Due Process Clause as limiting the power of courts to eliminate or change established property rights," *post*, at 3, his endorsement of the proposition that the Due Process Clause imposes "limits on government's ability to diminish property values by regulation," *ibid.*, and his contention that "the Due Process Clause would likely prevent a State from doing by judicial decree what the Takings Clause forbids it to do by legislative fiat," *post,* at 4 (internal quotation marks omitted).

The first problem with using Substantive Due Process to do the work of the Takings Clause is that we have held it cannot be done. "Where a particular Amendment 'provides an explicit textual source of constitutional protection' against a particular sort of government behavior, 'that Amendment, not the more generalized notion of "substantive due process," must be the guide for analyzing these claims.'" *Albright* v. *Oliver*, 510 U. S. 266, 273 (1994) (four-Justice plurality opinion) (quoting *Graham* v. *Connor*, 490 U. S. 386, 395 (1989)); see also 510 U. S., at 281 (KENNEDY, J., concurring in judgment) ("I agree with the plurality that an allegation of arrest without probable cause must be analyzed under the Fourth Amendment without reference to more general considerations of due process"). The second problem is that we have held for many years (logically or not) that the "liberties" protected by Substantive Due Process do not include economic liberties. See, *e.g., Lincoln Fed. Labor Union* v. *Northwestern Iron & Metal Co.*, 335 U. S. 525, 536 (1949). JUSTICE KENNEDY's language ("If a judicial decision . . . eliminates an established property right, the judgment could be set aside as a deprivation of property without due process of law," *post*, at 3) propels us back to what is referred to (usually deprecatingly) as "the *Lochner* era." See *Lochner* v. *New York*, 198 U. S 45, 56–58 (1905). That is a step of much greater novelty, and much more unpredictable

effect, than merely applying the Takings Clause to judicial action. And the third and last problem with using Substantive Due Process is that either (1) it will not do all that the Takings Clause does, or (2) if it does all that the Takings Clause does, it will encounter the same supposed difficulties that JUSTICE KENNEDY finds troublesome.

We do not grasp the relevance of JUSTICE KENNEDY's speculation, *post*, at 6, that the Framers did not envision the Takings Clause would apply to judicial action. They doubtless did not, since the Constitution was adopted in an era when courts had no power to "change" the common law. See 1 Blackstone 69–70 (1765); *Rogers* v. *Tennessee*, 532 U. S. 451, 472–478 (2001) (SCALIA, J., dissenting). Where the text they adopted is clear, however ("nor shall private property be taken for public use"), what counts is not what they envisioned but what they wrote. Of course even after courts, in the 19th century, did assume the power to change the common law, it is not true that the new "common-law tradition . . . allows for incremental modifications to property law," *post*, at 4, so that "owners may reasonably expect or anticipate courts to make certain changes in property law," *post,* at 6. In the only sense in which this could be relevant to what we are discussing, that is an astounding statement. We are talking here about judicial elimination of established private property rights. If that is indeed a "common-law tradition," JUSTICE KENNEDY ought to be able to provide a more solid example for it than the only one he cites, *post*, at 5, a state-court change (from "noxious" to "harmful") of the test for determining whether a neighbor's vegetation is a tortious nuisance. *Fancher* v. *Fagella*, 274 Va. 549, 555–556, 650 S. E. 2d 519, 522 (2007). But perhaps he does not really mean that it is a common-law tradition to eliminate property rights, since he immediately follows his statement that "owners may reasonably expect or anticipate courts to make certain changes in property law" with the

contradictory statement that "courts cannot abandon settled principles," *post,* at 6. If no "settled principl[e]" has been abandoned, it is hard to see how property law could have been "change[d]," rather than merely clarified.

JUSTICE KENNEDY has added "two additional practical considerations that the Court would need to address before recognizing judicial takings," *post*, at 7. One of them is simple and simply answered: the assertion that "it is unclear what remedy a reviewing court could enter after finding a judicial taking," *post,* at 8. JUSTICE KENNEDY worries that we may only be able to mandate compensation. That remedy is even rare for a legislative or executive taking, and we see no reason why it would be the exclusive remedy for a judicial taking. If we were to hold that the Florida Supreme Court had effected an uncompensated taking in the present case, we would simply reverse the Florida Supreme Court's judgment that the Beach and Shore Preservation Act can be applied to the property in question. JUSTICE KENNEDY's other point, *post,* at 7–8—that we will have to decide when the claim of a judicial taking must be asserted—hardly presents an awe-inspiring prospect. These, and all the other "difficulties," *post,* at 1, "difficult questions," *post,* at 5, and "practical considerations" *post,* at 7, that JUSTICE KENNEDY worries *may perhaps* stand in the way of recognizing a judicial taking, are either nonexistent or insignificant.

Finally, we cannot avoid comment upon JUSTICE KENNEDY's donning of the mantle of judicial restraint—his assertion that it is we, and not he, who would empower the courts and encourage their expropriation of private property. He warns that if judges know that their action is covered by the Takings Clause, they will issue "sweeping new rule[s] to adjust the rights of property owners," comfortable in the knowledge that their innovations will be preserved upon payment by the State. *Post*, at 6. That is quite impossible. As we have said, if we were to hold

that the Florida Supreme Court had effected an uncompensated taking in this case, we would not validate the taking by ordering Florida to pay compensation. We would simply reverse the Florida Supreme Court's judgment that the Beach and Shore Preservation Act can be applied to the Members' property. The power to effect a *compensated* taking would then reside, where it has always resided, not in the Florida Supreme Court but in the Florida Legislature—which could either provide compensation or acquiesce in the invalidity of the offending features of the Act. Cf. *Davis* v. *Michigan Dept. of Treasury*, 489 U. S. 803, 817–818 (1989). The only realistic incentive that subjection to the Takings Clause might provide to any court would be the incentive to get reversed, which in our experience few judges value.

JUSTICE KENNEDY, however, while dismissive of the Takings Clause, places no other constraints on judicial action. He puts forward some extremely vague applications of Substantive Due Process, and does not even say that they (whatever they are) will *for sure* apply. ("It is thus natural to read the Due Process Clause as limiting the power of courts to eliminate or change established property rights," *post*, at 3; "courts . . . may not have the power to eliminate established property rights by judicial decision," *post*, at 4; "the Due Process Clause would likely prevent a State from doing by judicial decree what the Takings Clause forbids it to do by legislative fiat," *post*, at 4–5 (internal quotation marks omitted); we must defer applying the Takings Clause until "[i]f and when future cases show that the usual principles, including constitutional principles that constrain the judiciary like due process, are somehow inadequate to protect property owners," *post*, at 10.)

Moreover, and more importantly, JUSTICE KENNEDY places no constraints whatever upon *this* Court. Not only does his concurrence only *think about* applying Substan-

tive Due Process; but because Substantive Due Process is such a wonderfully malleable concept, see, *e.g., Lawrence* v. *Texas*, 539 U. S. 558, 562 (2003) (referring to "liberty of the person both in its spatial and in its more transcendent dimensions"), even a firm commitment to apply it would be a firm commitment to nothing in particular. JUSTICE KENNEDY's desire to substitute Substantive Due Process for the Takings Clause suggests, and the rest of what he writes confirms, that what holds him back from giving the Takings Clause its natural meaning is not the *intrusiveness* of applying it to judicial action, but the *definiteness* of doing so; not a concern to preserve the powers of the States' political branches, but a concern to preserve this Court's discretion to say that property may be taken, or may not be taken, as in the Court's view the circumstances suggest. We must not say that we are bound by the Constitution never to sanction judicial elimination of clearly established property rights. Where the power of this Court is concerned, one must *never* say never. See, *e.g.*, *Vieth* v. *Jubelirer*, 541 U. S. 267, 302–305 (2004) (plurality opinion); *Sosa* v. *Alvarez-Machain*, 542 U. S. 692, 750–751 (2004) (SCALIA, J., concurring in part and concurring in judgment). The great attraction of Substantive Due Process as a substitute for more specific constitutional guarantees is that it *never* means never—because it never means anything precise.

## III

Respondents put forward a number of arguments which contradict, to a greater or lesser degree, the principle discussed above, that the existence of a taking does not depend upon the branch of government that effects it. First, in a case claiming a judicial taking they would add to our normal takings inquiry a requirement that the court's decision have no "fair and substantial basis." This is taken from our jurisprudence dealing with the question

whether a state-court decision rests upon adequate and independent state grounds, placing it beyond our jurisdiction to review. See E. Gressman, K. Geller, S. Shapiro, T. Bishop, & E. Hartnett, Supreme Court Practice, ch. 3.26, p. 222 (9th ed. 2007). To assure that there is no "evasion" of our authority to review federal questions, we insist that the nonfederal ground of decision have "fair support." *Broad River Power Co.* v. *South Carolina ex rel. Daniel*, 281 U. S. 537, 540 (1930); see also *Ward* v. *Board of Comm'rs of Love Cty.*, 253 U. S. 17, 22–23 (1920). A test designed to determine whether there has been an evasion is not obviously appropriate for determining whether there has been a taking of property. But if it is to be extended there it must mean (in the present context) that there is a "fair and substantial basis" for believing that petitioner's Members did not have a property right to future accretions which the Act would take away. This is no different, we think, from our requirement that petitioners' Members must prove the elimination of an established property right.[9]

Next, respondents argue that federal courts lack the knowledge of state law required to decide whether a judi-

_____

[9] JUSTICE BREYER complains that we do not set forth "procedural limitations or canons of deference" to restrict federal-court review of state-court property decisions. See *post*, at 2. (1) To the extent this is true it is unsurprising, but (2) fundamentally, it is false: (1) It is true that we make our own determination, without deference to state judges, whether the challenged decision deprives the claimant of an established property right. That is unsurprising because it is what this Court does when determining state-court compliance with *all* constitutional imperatives. We do not defer to the judgment of state judges in determining whether, for example, a state-court decision has deprived a defendant of due process or subjected him to double jeopardy. (2) The test we have adopted, however (deprivation of an *established* property right), contains within itself a considerable degree of deference to state courts. A property right is not established if there is doubt about its existence; and when there is doubt we do not make our own assessment but accept the determination of the state court.

cial decision that purports merely to clarify property rights has instead taken them. But federal courts must often decide what state property rights exist in nontakings contexts, see, *e.g., Board of Regents of State Colleges* v. *Roth*, 408 U. S. 564, 577–578 (1972) (Due Process Clause). And indeed they must decide it to resolve claims that legislative or executive action has effected a taking. For example, a regulation that deprives a property owner of all economically beneficial use of his property is not a taking if the restriction "inhere[s] in the title itself, in the restrictions that background principles of the State's law of property and nuisance already place upon land ownership." *Lucas*, 505 U. S., at 1029. A constitutional provision that forbids the uncompensated taking of property is quite simply insusceptible of enforcement by federal courts unless they have the power to decide what property rights exist under state law.

Respondents also warn us against depriving common-law judging of needed flexibility. That argument has little appeal when directed against the enforcement of a constitutional guarantee adopted in an era when, as we said *supra*, at 17, courts had no power to "change" the common law. But in any case, courts have no peculiar need of flexibility. It is no more essential that judges be free to overrule prior cases that establish property entitlements than that state legislators be free to revise pre-existing statutes that confer property entitlements, or agency-heads pre-existing regulations that do so. And insofar as courts merely clarify and elaborate property entitlements that were previously unclear, they cannot be said to have taken an established property right.

Finally, the city and county argue that applying the Takings Clause to judicial decisions would force lower federal courts to review final state-court judgments, in violation of the so-called *Rooker-Feldman* doctrine. See *Rooker* v. *Fidelity Trust Co.*, 263 U. S. 413, 415–416

(1923); *District of Columbia Court of Appeals* v. *Feldman*, 460 U. S. 462, 476 (1983). That does not necessarily follow. The finality principles that we regularly apply to takings claims, see *Williamson County Regional Planning Comm'n* v. *Hamilton Bank of Johnson City,* 473 U. S. 172, 186–194 (1985), would require the claimant to appeal a claimed taking by a lower court to the state supreme court, whence certiorari would come to this Court. If certiorari were denied, the claimant would no more be able to launch a lower-court federal suit against the taking effected by the state supreme-court opinion than he would be able to launch such a suit against a legislative or executive taking approved by the state supreme-court opinion; the matter would be res judicata. And where the claimant was not a party to the original suit, he would be able to challenge in federal court the taking effected by the state supreme-court opinion to the same extent that he would be able to challenge in federal court a legislative or executive taking previously approved by a state supreme-court opinion.

For its part, petitioner proposes an unpredictability test. Quoting Justice Stewart's concurrence in *Hughes* v. *Washington*, 389 U. S. 290, 296 (1967), petitioner argues that a judicial taking consists of a decision that "'constitutes a sudden change in state law, unpredictable in terms of relevant precedents.'" See Brief for Petitioner 17, 34–50. The focus of petitioner's test is misdirected. What counts is not whether there is precedent for the allegedly confiscatory decision, but whether the property right allegedly taken was established. A "predictability of change" test would cover both too much and too little. Too much, because a judicial property decision need not be predictable, so long as it does not declare that what had been private property under established law no longer is. A decision that clarifies property entitlements (or the lack thereof) that were previously unclear might be difficult to predict,

but it does not eliminate established property rights. And the predictability test covers too little, because a judicial elimination of established private-property rights that is foreshadowed by dicta or even by holdings years in advance is nonetheless a taking. If, for example, a state court held in one case, to which the complaining property owner was not a party, that it had the power to limit the acreage of privately owned real estate to 100 acres, and then, in a second case, applied that principle to declare the complainant's 101st acre to be public property, the State would have taken an acre from the complainant even though the decision was predictable.

## IV

We come at last to petitioner's takings attack on the decision below. At the outset, respondents raise two preliminary points which need not detain us long. The city and the county argue that petitioner cannot state a cause of action for a taking because, though the Members own private property, petitioner itself does not; and that the claim is unripe because petitioner has not sought just compensation. Neither objection appeared in the briefs in opposition to the petition for writ of certiorari, and since neither is jurisdictional,[10] we deem both waived. See this Court's Rule 15.2; cf. *Oklahoma City* v. *Tuttle*, 471 U. S. 808, 815–816 (1985).

Petitioner argues that the Florida Supreme Court took two of the property rights of the Members by declaring that those rights did not exist: the right to accretions, and the right to have littoral property touch the water (which

---

[10] Petitioner meets the two requirements necessary for an association to assert the Article III standing of its Members. See *Food and Commercial Workers* v. *Brown Group, Inc.*, 517 U. S. 544, 555–557 (1996). And the claim here is ripe insofar as Article III standing is concerned, since (accepting petitioner's version of Florida law as true) petitioner has been deprived of property.

petitioner distinguishes from the mere right of access to the water).[11]  Under petitioner's theory, because no prior Florida decision had said that the State's filling of submerged tidal lands could have the effect of depriving a littoral owner of contact with the water and denying him future accretions, the Florida Supreme Court's judgment in the present case abolished those two easements to which littoral property owners had been entitled.  This puts the burden on the wrong party.  There is no taking unless petitioner can show that, before the Florida Supreme Court's decision, littoral-property owners had rights to future accretions and contact with the water superior to the State's right to fill in its submerged land.  Though some may think the question close, in our view the showing cannot be made.

Two core principles of Florida property law intersect in this case.  First, the State as owner of the submerged land adjacent to littoral property has the right to fill that land, so long as it does not interfere with the rights of the public and the rights of littoral landowners.  See *Hayes* v. *Bowman*, 91 So. 2d 795, 799–800 (Fla. 1957) (right to fill conveyed by State to private party); *State ex rel. Buford* v. *Tampa*, 88 Fla. 196, 210–211, 102 So. 336, 341 (1924)

---

[11] Petitioner raises two other claims that we do not directly address. First, petitioner tries to revive its challenge to the beach restoration project, contending that it (rather than the Florida Supreme Court's opinion) constitutes a taking.  Petitioner's arguments on this score are simply versions of two arguments it makes against the Florida Supreme Court's opinion: that the Department has replaced the Members' littoral property rights with versions that are inferior because statutory; and that the Members previously had the right to have their property contact the water.  We reject both, *infra*, at 28–29, and n. 12. Second, petitioner attempts to raise a challenge to the Act as a deprivation of property without due process.  Petitioner did not raise this challenge before the Florida Supreme Court, and only obliquely raised it in the petition for certiorari.  We therefore do not reach it.  See *Adams*, 520 U. S., at 86–87.

(same). Second, as we described *supra*, at 3–4, if an avulsion exposes land seaward of littoral property that had previously been submerged, that land belongs to the State even if it interrupts the littoral owner's contact with the water. See *Bryant*, 238 So. 2d, at 837, 838–839. The issue here is whether there is an exception to this rule when the State is the cause of the avulsion. Prior law suggests there is not. In *Martin* v. *Busch*, 93 Fla. 535, 112 So. 274 (1927), the Florida Supreme Court held that when the State drained water from a lakebed belonging to the State, causing land that was formerly below the mean highwater line to become dry land, that land continued to belong to the State. *Id.*, at 574, 112 So., at 287; see also *Bryant*, *supra*, at 838–839 (analogizing the situation in *Martin* to an avulsion). "'The riparian rights doctrine of accretion and reliction,'" the Florida Supreme Court later explained, "'does not apply to such lands.'" *Bryant*, *supra*, at 839 (quoting *Martin*, *supra*, at 578, 112 So., at 288 (Brown, J., concurring)). This is not surprising, as there can be no accretions to land that no longer abuts the water.

Thus, Florida law as it stood before the decision below allowed the State to fill in its own seabed, and the resulting sudden exposure of previously submerged land was treated like an avulsion for purposes of ownership. The right to accretions was therefore subordinate to the State's right to fill. *Thiesen* v. *Gulf, Florida & Alabama R. Co.* suggests the same result. That case involved a claim by a riparian landowner that a railroad's state-authorized filling of submerged land and construction of tracks upon it interfered with the riparian landowners' rights to access and to wharf out to a shipping channel. The Florida Supreme Court determined that the claimed right to wharf out did not exist in Florida, and that therefore only the right of access was compensable. 75 Fla., at 58–65, 78 So.*,* at 501–503. Significantly, although the court recognized that the riparian-property owners had rights to accretion,

see *id.,* at 64–65, 78 So., at 502–503, the only rights it even suggested would be infringed by the railroad were the right of access (which the plaintiff had claimed) and the rights of view and use of the water (which it seems the plaintiff had not claimed), see *id.,* at 58–59, 78, 78 So., at 501, 507.

The Florida Supreme Court decision before us is consistent with these background principles of state property law. Cf. *Lucas*, 505 U. S., at 1028–1029; *Scranton* v. *Wheeler*, 179 U. S. 141, 163 (1900). It did not abolish the Members' right to future accretions, but merely held that the right was not implicated by the beach-restoration project, because the doctrine of avulsion applied. See 998 So. 2d, at 1117, 1120–1121. The Florida Supreme Court's opinion describes beach restoration as the reclamation by the State of the public's land, just as *Martin* had described the lake drainage in that case. Although the opinion does not cite *Martin* and is not always clear on this point, it suffices that its characterization of the littoral right to accretion is consistent with *Martin* and the other relevant principles of Florida law we have discussed.

What we have said shows that the rule of *Sand Key,* which petitioner repeatedly invokes, is inapposite. There the Florida Supreme Court held that an artificial accretion does not change the right of a littoral-property owner to claim the accreted land as his own (as long as the owner did not cause the accretion himself). 512 So. 2d, at 937–938. The reason *Martin* did not apply, *Sand Key* explained, is that the drainage that had occurred in *Martin* did not lower the water level by "'imperceptible degrees,'" and so did not qualify as an accretion. 512 So. 2d, at 940–941.

The result under Florida law may seem counter-intuitive. After all, the Members' property has been deprived of its character (and value) as oceanfront property by the State's artificial creation of an avulsion. Perhaps

state-created avulsions ought to be treated differently
from other avulsions insofar as the property right to accre-
tion is concerned. But nothing in prior Florida law makes
such a distinction, and *Martin* suggests, if it does not
indeed hold, the contrary. Even if there might be different
interpretations of *Martin* and other Florida property-law
cases that would prevent this arguably odd result, we are
not free to adopt them. The Takings Clause only protects
property rights as they are established under state law,
not as they might have been established or ought to have
been established. We cannot say that the Florida Su-
preme Court's decision eliminated a right of accretion
established under Florida law.

Petitioner also contends that the State took the Mem-
bers' littoral right to have their property continually main-
tain contact with the water. To be clear, petitioner does
not allege that the State relocated the property line, as
would have happened if the erosion-control line were
*landward* of the old mean high-water line (instead of
identical to it). Petitioner argues instead that the Mem-
bers have a separate right for the boundary of their prop-
erty to be always the mean high-water line. Petitioner
points to dicta in *Sand Key* that refers to "the right to have
the property's contact with the water remain intact," 512
So. 2d, at 936. Even there, the right was included in the
definition of the right to access, *ibid.*, which is consistent
with the Florida Supreme Court's later description that
"there is no independent right of contact with the water"
but it "exists to preserve the upland owner's core littoral
right of access to the water," 998 So. 2d, at 1119. Peti-
tioner's expansive interpretation of the dictum in *Sand
Key* would cause it to contradict the clear Florida law
governing avulsion. One cannot say that the Florida
Supreme Court contravened established property law by

rejecting it.[12]

## V

Because the Florida Supreme Court's decision did not contravene the established property rights of petitioner's Members, Florida has not violated the Fifth and Fourteenth Amendments. The judgment of the Florida Supreme Court is therefore affirmed.

*It is so ordered.*

JUSTICE STEVENS took no part in the decision of this case.

—————

[12] Petitioner also argues that the Members' other littoral rights have been infringed because the Act replaces their common-law rights with inferior statutory versions. Petitioner has not established that the statutory versions are inferior; and whether the source of a property right is the common law or a statute makes no difference, so long as the property owner continues to have what he previously had.

# SUPREME COURT OF THE UNITED STATES

No. 08–1151

STOP THE BEACH RENOURISHMENT, INC.,
PETITIONER *v.* FLORIDA DEPARTMENT OF
ENVIRONMENTAL PROTECTION ET AL.

ON WRIT OF CERTIORARI TO THE SUPREME COURT OF
FLORIDA

[June 17, 2010]

JUSTICE KENNEDY, with whom JUSTICE SOTOMAYOR joins, concurring in part and concurring in the judgment.

The Court's analysis of the principles that control ownership of the land in question, and of the rights of petitioner's members as adjacent owners, is correct in my view, leading to my joining Parts I, IV, and V of the Court's opinion. As JUSTICE BREYER observes, however, this case does not require the Court to determine whether, or when, a judicial decision determining the rights of property owners can violate the Takings Clause of the Fifth Amendment of the United States Constitution. This separate opinion notes certain difficulties that should be considered before accepting the theory that a judicial decision that eliminates an "established property right," *ante*, at 21, constitutes a violation of the Takings Clause.

The Takings Clause is an essential part of the constitutional structure, for it protects private property from expropriation without just compensation; and the right to own and hold property is necessary to the exercise and preservation of freedom. The right to retain property without the fact or even the threat of that sort of expropriation is, of course, applicable to the States under the Due Process Clause of the Fourteenth Amendment. *Chicago, B. & Q. R. Co.* v. *Chicago*, 166 U. S. 226, 239 (1897).

The right of the property owner is subject, however, to the rule that the government does have power to take property for a public use, provided that it pays just compensation. See *First English Evangelical Lutheran Church of Glendale* v. *County of Los Angeles*, 482 U. S. 304, 314–315 (1987). This is a vast governmental power. And typically, legislative bodies grant substantial discretion to executive officers to decide what property can be taken for authorized projects and uses. As a result, if an authorized executive agency or official decides that Blackacre is the right place for a fire station or Greenacre is the best spot for a freeway interchange, then the weight and authority of the State are used to take the property, even against the wishes of the owner, who must be satisfied with just compensation.

In the exercise of their duty to protect the fisc, both the legislative and executive branches monitor, or should monitor, the exercise of this substantial power. Those branches are accountable in their political capacity for the proper discharge of this obligation.

To enable officials to better exercise this great power in a responsible way, some States allow their officials to take a second look after property has been condemned and a jury returns a verdict setting the amount of just compensation. See, *e.g.,* Cal. Civ. Proc. Code Ann. §1268.510 (2007). If the condemning authority, usually acting through the executive, deems the compensation too high to pay for the project, it can decide not to take the property at all. The landowner is reimbursed for certain costs and expenses of litigation and the property remains in his or her hands. See, *e.g.,* §1268.610(a).

This is just one aspect of the exercise of the power to select what property to condemn and the responsibility to ensure that the taking makes financial sense from the State's point of view. And, as a matter of custom and practice, these are matters for the political branches—the

legislature and the executive—not the courts.  See *First English*, *supra*, at 321 ("[T]he decision to exercise the power of eminent domain is a legislative function").

If a judicial decision, as opposed to an act of the executive or the legislature, eliminates an established property right, the judgment could be set aside as a deprivation of property without due process of law.  The Due Process Clause, in both its substantive and procedural aspects, is a central limitation upon the exercise of judicial power.  And this Court has long recognized that property regulations can be invalidated under the Due Process Clause.  See, *e.g., Lingle* v. *Chevron U. S. A. Inc.*, 544 U. S. 528, 542 (2005); *Goldblatt* v. *Hempstead*, 369 U. S. 590, 591, 592–593 (1962); *Demorest* v. *City Bank Farmers Trust Co.*, 321 U. S. 36, 42–43 (1944); *Broad River Power Co.* v. *South Carolina ex rel. Daniel*, 281 U. S. 537, 539, 540–541 (1930); *Washington ex rel. Seattle Title Trust Co.* v. *Roberge*, 278 U. S. 116, 121 (1928); *Nectow* v. *Cambridge*, 277 U. S. 183, 188 (1928); *Village of Euclid* v. *Ambler Realty Co.*, 272 U. S. 365, 395 (1926); see also *Pennsylvania Coal Co.* v. *Mahon*, 260 U. S. 393, 413 (1922) (there must be limits on government's ability to diminish property values by regulation "or the contract and due process clauses are gone").  It is thus natural to read the Due Process Clause as limiting the power of courts to eliminate or change established property rights.

The Takings Clause also protects property rights, and it "operates as a conditional limitation, permitting the government to do what it wants so long as it pays the charge." *Eastern Enterprises* v. *Apfel*, 524 U. S. 498, 545 (1998) (KENNEDY, J., concurring in judgment and dissenting in part).  Unlike the Due Process Clause, therefore, the Takings Clause implicitly recognizes a governmental power while placing limits upon that power.  Thus, if the Court were to hold that a judicial taking exists, it would presuppose that a judicial decision eliminating established

property rights is "otherwise constitutional" so long as the State compensates the aggrieved property owners. *Ibid.* There is no clear authority for this proposition.

When courts act without direction from the executive or legislature, they may not have the power to eliminate established property rights by judicial decision. "Given that the constitutionality" of a judicial decision altering property rights "appears to turn on the legitimacy" of whether the court's judgment eliminates or changes established property rights "rather than on the availability of compensation, . . . the more appropriate constitutional analysis arises under general due process principles rather than under the Takings Clause." *Ibid.* Courts, unlike the executive or legislature, are not designed to make policy decisions about "the need for, and likely effectiveness of, regulatory actions." *Lingle*, *supra*, at 545. State courts generally operate under a common-law tradition that allows for incremental modifications to property law, but "this tradition cannot justify a *carte blanch* judicial authority to change property definitions wholly free of constitutional limitations." Walston, The Constitution and Property: Due Process, Regulatory Takings, and Judicial Takings, 2001 Utah L. Rev. 379, 435.

The Court would be on strong footing in ruling that a judicial decision that eliminates  or substantially changes established property rights, which are a legitimate expectation of the owner, is "arbitrary or irrational" under the Due Process Clause. *Lingle*, 544 U. S., at 542; see *id.*, at 548–549 (KENNEDY, J., concurring); see also *Perry* v. *Sindermann*, 408 U. S. 593, 601 (1972) ("'[P]roperty'" interests protected by the Due Process Clauses are those "that are secured by 'existing rules or understandings'" (quoting *Board of Regents of State Colleges* v. *Roth*, 408 U. S. 564, 577 (1972))).  Thus, without a judicial takings doctrine, the Due Process Clause would likely prevent a State from doing "by judicial decree what the Takings

Clause forbids it to do by legislative fiat." *Ante,* at 8. The objection that a due process claim might involve close questions concerning whether a judicial decree extends beyond what owners might have expected is not a sound argument; for the same close questions would arise with respect to whether a judicial decision is a taking. See *Apfel, supra*, at 541 (opinion of KENNEDY, J.) ("Cases attempting to decide when a regulation becomes a taking are among the most litigated and perplexing in current law"); *Penn Central Transp. Co.* v. *New York City*, 438 U. S. 104, 123 (1978) ("The question of what constitutes a 'taking' for purposes of the Fifth Amendment has proved to be a problem of considerable difficulty").

To announce that courts too can effect a taking when they decide cases involving property rights, would raise certain difficult questions. Since this case does not require those questions to be addressed, in my respectful view, the Court should not reach beyond the necessities of the case to announce a sweeping rule that court decisions can be takings, as that phrase is used in the Takings Clause. The evident reason for recognizing a judicial takings doctrine would be to constrain the power of the judicial branch. Of course, the judiciary must respect private ownership. But were this Court to say that judicial decisions become takings when they overreach, this might give more power to courts, not less.

Consider the instance of litigation between two property owners to determine which one bears the liability and costs when a tree that stands on one property extends its roots in a way that damages adjacent property. See, *e.g., Fancher* v. *Fagella,* 274 Va. 549, 650 S. E. 2d 519 (2007). If a court deems that, in light of increasing urbanization, the former rule for allocation of these costs should be changed, thus shifting the rights of the owners, it may well increase the value of one property and decrease the value of the other. This might be the type of incremental

modification under state common law that does not violate
due process, as owners may reasonably expect or antici-
pate courts to make certain changes in property law.  The
usual due process constraint is that courts cannot abandon
settled principles.  See, *e.g., Rogers* v. *Tennessee*, 532 U. S.
451, 457 (2001) (citing *Bouie* v. *City of Columbia*, 378 U. S.
347, 354 (1964)); *Apfel*, 524 U. S., at 548–549 (opinion of
KENNEDY, J.); see also *Perry*, *supra*, at 601; *Roth*, *supra*,
at 577.

But if the state court were deemed to be exercising the
power to take property, that constraint would be removed.
Because the State would be bound to pay owners for tak-
ings caused by a judicial decision, it is conceivable that
some judges might decide that enacting a sweeping new
rule to adjust the rights of property owners in the context
of changing social needs is a good idea.  Knowing that the
resulting ruling would be a taking, the courts could go
ahead with their project, free from constraints that would
otherwise confine their power.  The resulting judgment as
between the property owners likely could not be set aside
by some later enactment.  See *Plaut* v. *Spendthrift Farm,
Inc.*, 514 U. S. 211, 217 (1995) (leaving open whether
legislation reopening final judgments violates Due Process
Clause).  And if the litigation were a class action to decide,
for instance, whether there are public rights of access that
diminish the rights of private ownership, a State might
find itself obligated to pay a substantial judgment for the
judicial ruling.  Even if the legislature were to subse-
quently rescind the judicial decision by statute, the State
would still have to pay just compensation for the tempo-
rary taking that occurred from the time of the judicial
decision to the time of the statutory fix.  See *First English*,
482 U. S., at 321.

The idea, then, that a judicial takings doctrine would
constrain judges might just well have the opposite effect.
It would give judges new power and new assurance that

changes in property rights that are beneficial, or thought to be so, are fair and proper because just compensation will be paid. The judiciary historically has not had the right or responsibility to say what property should or should not be taken.

Indeed, it is unclear whether the Takings Clause was understood, as a historical matter, to apply to judicial decisions. The Framers most likely viewed this Clause as applying only to physical appropriation pursuant to the power of eminent domain. See *Lucas* v. *South Carolina Coastal Council*, 505 U. S. 1003, 1028, n. 15 (1992). And it appears these physical appropriations were traditionally made by legislatures. See 3 J. Story, Commentaries on the Constitution of the United States §1784, p. 661 (1833). Courts, on the other hand, lacked the power of eminent domain. See 1 W. Blackstone, Commentaries 135 (W. Lewis ed. 1897). The Court's Takings Clause jurisprudence has expanded beyond the Framers' understanding, as it now applies to certain regulations that are not physical appropriations. See *Lucas*, *supra*, at 1014 (citing *Mahon*, 260 U. S. 393). But the Court should consider with care the decision to extend the Takings Clause in a manner that might be inconsistent with historical practice.

There are two additional practical considerations that the Court would need to address before recognizing judicial takings. First, it may be unclear in certain situations how a party should properly raise a judicial takings claim. "[I]t is important to separate out two judicial actions—the decision to change current property rules in a way that would constitute a taking, and the decision to require compensation." Thompson, Judicial Takings, 76 Va. L. Rev. 1449, 1515 (1990). In some contexts, these issues could arise separately. For instance, assume that a state-court opinion explicitly holds that it is changing state property law, or that it asserts that is not changing the

law but there is no "fair or substantial basis" for this
statement. *Broad River*, 281 U. S., at 540. (Most of these
cases may arise in the latter posture, like inverse condem-
nation claims where the State says it is not taking prop-
erty and pays no compensation.) Call this Case A. The
only issue in Case A was determining the substance of
state property law. It is doubtful that parties would raise
a judicial takings claim on appeal, or in a petition for a
writ of certiorari, in Case A, as the issue would not have
been litigated below. Rather, the party may file a sepa-
rate lawsuit—Case B—arguing that a taking occurred in
light of the change in property law made by Case A. After
all, until the state court in Case A changes the law, the
party will not know if his or her property rights will have
been eliminated. So res judicata probably would not bar
the party from litigating the takings issue in Case B.

Second, it is unclear what remedy a reviewing court
could enter after finding a judicial taking. It appears
under our precedents that a party who suffers a taking is
only entitled to damages, not equitable relief: The Court
has said that "[e]quitable relief is not available to enjoin
an alleged taking of private property for a public use . . .
when a suit for compensation can be brought against the
sovereign subsequent to the taking," *Ruckelshaus* v. *Mon-
santo Co.*, 467 U. S. 986, 1016 (1984), and the Court sub-
sequently held that the Takings Clause requires the avail-
ability of a suit for compensation against the States, *First
English*, *supra*, at 321–322. It makes perfect sense that
the remedy for a Takings Clause violation is only dam-
ages, as the Clause "does not proscribe the taking of prop-
erty; it proscribes taking without just compensation."
*Williamson County Regional Planning Comm'n* v. *Hamil-
ton Bank of Johnson City*, 473 U. S. 172, 194 (1985).

It is thus questionable whether reviewing courts could
invalidate judicial decisions deemed to be judicial takings;
they may only be able to order just compensation. In the

posture discussed above where Case A changes the law and Case B addresses whether that change is a taking, it is not clear how the Court, in Case B, could invalidate the holding of Case A. If a single case were to properly address both a state court's change in the law and whether the change was a taking, the Court might be able to give the state court a choice on how to proceed if there were a judicial taking. The Court might be able to remand and let the state court determine whether it wants to insist on changing its property law and paying just compensation or to rescind its holding that changed the law. Cf. *First English*, 482 U. S., at 321 ("Once a court determines that a taking has occurred, the government retains the whole range of options already available—amendment of the regulation, withdrawal of the invalidated regulation, or exercise of eminent domain"). But that decision would rest with the state court, not this Court; so the state court could still force the State to pay just compensation. And even if the state court decided to rescind its decision that changed the law, a temporary taking would have occurred in the interim. See *ibid.*

These difficult issues are some of the reasons why the Court should not reach beyond the necessities of the case to recognize a judicial takings doctrine. It is not wise, from an institutional standpoint, to reach out and decide questions that have not been discussed at much length by courts and commentators. This Court's dicta in *Williamson County*, *supra*, at 194–197, regarding when regulatory takings claims become ripe, explains why federal courts have not been able to provide much analysis on the issue of judicial takings. See *San Remo Hotel, L. P.* v. *City and County of San Francisco*, 545 U. S. 323, 351 (2005) (Rehnquist, C. J., concurring in judgment) ("*Williamson County*'s state-litigation rule has created some real anomalies, justifying our revisiting the issue"). Until *Williamson County* is reconsidered, litigants will have to

press most of their judicial takings claims before state courts, which are "presumptively competent . . . to adjudicate claims arising under the laws of the United States." *Tafflin* v. *Levitt*, 493 U. S. 455, 458 (1990). If and when future cases show that the usual principles, including constitutional principles that constrain the judiciary like due process, are somehow inadequate to protect property owners, then the question whether a judicial decision can effect a taking would be properly presented. In the meantime, it seems appropriate to recognize that the substantial power to decide whose property to take and when to take it should be conceived of as a power vested in the political branches and subject to political control.

# SUPREME COURT OF THE UNITED STATES

_____

No. 08–1151

_____

STOP THE BEACH RENOURISHMENT, INC.,
PETITIONER *v.* FLORIDA DEPARTMENT OF
ENVIRONMENTAL PROTECTION ET AL.

ON WRIT OF CERTIORARI TO THE SUPREME COURT OF
FLORIDA

[June 17, 2010]

JUSTICE BREYER, with whom JUSTICE GINSBURG joins, concurring in part and concurring in the judgment.

I agree that no unconstitutional taking of property occurred in this case, and I therefore join Parts I, IV, and V of today's opinion. I cannot join Parts II and III, however, for in those Parts the plurality unnecessarily addresses questions of constitutional law that are better left for another day.

In Part II of its opinion, see *ante,* at 7–10, the plurality concludes that courts, including federal courts, may review the private property law decisions of state courts to determine whether the decisions unconstitutionally take "private property" for "public use without just compensation." U. S. Const., Amdt. 5. And in doing so it finds "irrelevant" that the "particular state *actor*" that takes private property (or unconstitutionally redefines state property law) is the judicial branch, rather than the executive or legislative branch. *Ante*, at 10; cf. *Hughes* v. *Washington*, 389 U. S. 290, 296–298 (1967) (Stewart, J., concurring).

In Part III, the plurality determines that it is "not obviously appropriate" to apply this Court's "'fair and substantial basis'" test, familiar from our adequate and independent state ground jurisprudence, when evaluating whether

a state-court property decision enacts an unconstitutional taking.  *Ante*, at 21.  The plurality further concludes that a state-court decision violates the Takings Clause not when the decision is "unpredictab[le]" on the basis of prior law, but rather when the decision takes private property rights that are "established."  *Ante,* at 23–24.  And finally, it concludes that all those affected by a state-court property law decision can raise a takings claim in federal court, *but for* the losing party in the initial state-court proceeding, who can only raise her claim (possibly for the first time) in a petition for a writ of certiorari here.  *Ante,* at 23.

I do not claim that all of these conclusions are unsound. I do not know.  But I do know that, if we were to express our views on these questions, we would invite a host of federal takings claims without the mature consideration of potential procedural or substantive legal principles that might limit federal interference in matters that are primarily the subject of state law.  Property owners litigate many thousands of cases involving state property law in state courts each year.  Each state-court property decision may further affect numerous nonparty property owners as well.  Losing parties in many state-court cases may well believe that erroneous judicial decisions have deprived them of property rights they previously held and may consequently bring federal takings claims.  And a glance at Part IV makes clear that such cases can involve state property law issues of considerable complexity.  Hence, the approach the plurality would take today threatens to open the federal court doors to constitutional review of many, perhaps large numbers of, state-law cases in an area of law familiar to state, but not federal, judges.  And the failure of that approach to set forth procedural limitations or canons of deference would create the distinct possibility that federal judges would play a major role in the shaping of a matter of significant state interest—state property law.

The plurality criticizes me for my cautious approach, and states that I "cannot decide that petitioner's claim fails without first deciding what a valid claim would consist of." *Ante,* at 12. But, of course, courts frequently find it possible to resolve cases—even those raising constitutional questions—without specifying the precise standard under which a party wins or loses. See, *e.g., Smith* v. *Spisak*, 558 U. S. \_\_\_, \_\_\_ (2010) (slip op., at 16) ("With or without such deference, our conclusion is the same"); *Quilloin* v. *Walcott*, 434 U. S. 246, 256 (1978) (rejecting an equal protection claim "[u]nder any standard of review"); *Mercer* v. *Theriot*, 377 U. S. 152, 156 (1964) *(per curiam)* (finding evidence sufficient to support a verdict "under any standard"). That is simply what I would do here.

In the past, Members of this Court have warned us that, when faced with difficult constitutional questions, we should "confine ourselves to deciding only what is necessary to the disposition of the immediate case." *Whitehouse* v. *Illinois Central R. Co.*, 349 U. S. 366, 373 (1955); see also *Lyng* v. *Northwest Indian Cemetery Protective Assn.*, 485 U. S. 439, 445 (1988) ("A fundamental and longstanding principle of judicial restraint requires that courts avoid reaching constitutional questions in advance of the necessity of deciding them"); *Ashwander* v. *TVA*, 297 U. S. 288, 346–347 (1936) (Brandeis, J., concurring) ("The Court will not anticipate a question of constitutional law in advance of the necessity of deciding it. It is not the habit of the Court to decide questions of a constitutional nature unless absolutely necessary to a decision of the case" (citations and internal quotation marks omitted)). I heed this advice here. There is no need now to decide more than what the Court decides in Parts IV and V, namely, that the Florida Supreme Court's decision in this case did not amount to a "judicial taking."