*450 Justice Thomas,
with whom Justice Scalia joins, and with whom The Chief Justice and Justice Alito join as to Parts I-B and II,
dissenting.
The Due Process Clause of the Fourteenth Amendment does not provide a right to appointed counsel for indigent defendants facing incarceration in civil contempt proceedings. Therefore, I would affirm. Although the Court agrees that appointed counsel was not required in this case, it nevertheless vacates the judgment of the South Carolina Supreme Court on a different ground, which the parties have never raised. Solely at the invitation of the United States as amicus curiae, the majority decides that Turner's contempt proceeding violated due process because it did not include “alternative procedural safeguards.” Ante, at 448. Consistent with this Court’s longstanding practice, I would not reach that question.[1]
I
The only question raised in this case is whether the Due Process Clause of the Fourteenth Amendment creates a right to appointed counsel for all indigent defendants facing incarceration in civil contempt proceedings. It does not.
A
Under an original understanding of the Constitution, there is no basis for concluding that the guarantee of due process secures a right to appointed counsel in civil contempt proceedings. It certainly does not do so to the extent that the Due Process Clause requires “‘that our Government must proceed according to the “law of the land” — that is, according to written constitutional and statutory provisions.’ ” Hamdi v. Rumsfeld, 542 U. S. 507, 589 (2004) (Thomas, J., dissenting) (quoting In re Winship, 397 U. S. 358, 382 (1970) *451 (Black, J., dissenting)). No one contends that South Carolina law entitles Turner to appointed counsel. Nor does any federal statute or constitutional provision so provide. Although the Sixth Amendment secures a right to “the Assistance of Counsel,” it does not apply here because civil contempt proceedings are not “criminal prosecutions.” U. S. Const., Arndt. 6; see ante, at 441-442. Moreover, as originally understood, the Sixth Amendment guaranteed only the “right to employ counsel, or to use volunteered services of counsel”; it did not require the court to appoint counsel in any circumstance. Padilla v. Kentucky, 559 U. S. 356, 389 (2010) (Scalia, J., dissenting); see also United States v. Van Duzee, 140 U. S. 169, 173 (1891); W. Beaney, The Right to Counsel in American Courts 21-22, 28-29 (1955); F. Heller, The Sixth Amendment to the Constitution of the United States 110 (1951).
Appointed counsel is also not required in civil contempt proceedings under a somewhat broader reading of the Due Process Clause, which takes it to approve “'[a] process of law, which is not otherwise forbidden,... [that] can show the sanction of settled usage.’” Weiss v. United States, 510 U. S. 163, 197 (1994) (Scaua, J., concurring in part and concurring in judgment) (quoting Hurtado v. California, 110 U. S. 516, 528 (1884)). Despite a long history of courts exercising contempt authority, Turner has not identified any evidence that courts appointed counsel in those proceedings. See Mine Workers v. Bagwell, 512 U. S. 821, 831 (1994) (describing courts’ traditional assumption of “inherent contempt authority”); see also 4 W. Blackstone, Commentaries on the Laws of England 280-285 (1769) (describing the “summary proceedings” used to adjudicate contempt). Indeed, Turner concedes that contempt proceedings without appointed counsel have the blessing of history. See Tr. of Oral Arg. 15-16 (admitting that there is no historical support for Turner’s rule); see also Brief for Respondents 47-48.
*452 B
Even under the Court’s modern interpretation of the Constitution, the Due Process Clause does not provide a right to appointed counsel for all indigent defendants facing incarceration in civil contempt proceedings. Such a reading would render the Sixth Amendment right to counsel — as it is currently understood — superfluous. Moreover, it appears that even cases applying the Court’s modern interpretation of due process have not understood it to categorically require appointed counsel in circumstances outside those otherwise covered by the Sixth Amendment.
1
Under the Court’s current jurisprudence, the Sixth Amendment entitles indigent defendants to appointed counsel in felony cases and other criminal cases resulting in a sentence of imprisonment. See Gideon v. Wainwright, 372 U. S. 335, 344-345 (1963); Argersinger v. Hamlin, 407 U. S. 25, 37 (1972); Scott v. Illinois, 440 U. S. 367, 373-374 (1979); Alabama v. Shelton, 535 U. S. 654, 662 (2002). Turner concedes that, even under these cases, the Sixth Amendment does not entitle him to appointed counsel. See Reply Brief for Petitioner 12 (acknowledging that “civil contempt is not a ‘criminal prosecution’ within the meaning of the Sixth Amendment”). He argues instead that “the right to the assistance of counsel for persons facing incarceration arises not only from the Sixth Amendment, but also from the requirement of fundamental fairness under the Due Process Clause of the Fourteenth Amendment.” Brief for Petitioner 28. In his view, this Court has relied on due process to “rejec[t] formalistic distinctions between criminal and civil proceedings, instead concluding that incarceration or other confinement triggers the right to counsel.” Id., at 33.
But if the Due Process Clause created a right to appointed counsel in all proceedings with the. potential for detention, then the Sixth Amendment right to appointed counsel would *453 be unnecessary. Under Turner’s theory, every instance in which the Sixth Amendment guarantees a right to appointed counsel is covered also by the Due Process Clause. The Sixth Amendment, however, is the only constitutional provision that even mentions the assistance of counsel; the Due Process Clause says nothing about counsel. Ordinarily, we do not read a general provision to render a specific one superfluous. Cf. Morales v. Trans World Airlines, Inc., 504 U. S. 374, 384 (1992) (“[I]t is a commonplace of statutory construction that the specific governs the general”). The fact that one constitutional provision expressly provides a right to appointed counsel in specific circumstances indicates that the Constitution does not also sub silentio provide that right far more broadly in another, more general, provision. Cf. Albright v. Oliver, 510 U. S. 266, 273 (1994) (plurality opinion) (“Where a particular Amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of 'substantive due process/ must be the guide for analyzing these claims” (some internal quotation marks omitted)); id., at 281 (Kennedy, J., concurring in judgment) (“I agree with the plurality that an allegation of arrest without probable cause must be analyzed under the Fourth Amendment without reference to more general considerations of due process”); Stop the Beach Renourishment, Inc. v. Florida Dept. of Environmental Protection, 560 U. S. 702, 721 (2010) (opinion of Scalia, J.) (applying Al-bright to the Takings Clause).
2
Moreover, contrary to Turner’s assertions, the holdings in this Court’s due process decisions regarding the right to counsel are actually quite narrow. The Court has never found in the Due Process Clause a categorical right to appointed counsel outside of criminal prosecutions or proceedings “functionally akin to a criminal trial.” Gagnon v. *454 Scarpelli, 411 U. S. 778, 789, n. 12 (1973) (discussing In re Gault, 387 U. S. 1 (1967)). This is consistent with the conclusion that the Due Process Clause does not expand the right to counsel beyond the boundaries set by the Sixth Amendment.
After countless factors weighed, mores evaluated, and practices surveyed, the Court has not determined that due process principles of fundamental fairness categorically require counsel in any context outside criminal proceedings. See, e. g., Lassiter v. Department of Social Servs. of Durham Cty., 452 U. S. 18, 31-32 (1981); Wolff v. McDonnell, 418 U. S. 539, 569-570 (1974); see also Walters v. National Assn. of Radiation Survivors, 473 U. S. 305, 307-308, 320-326 (1985); Goss v. Lopez, 419 U. S. 565, 583 (1975). Even when the defendant’s liberty is at stake, the Court has not concluded that fundamental fairness requires that counsel always be appointed if the proceeding is not criminal.[2] See, e. g., Scarpelli, supra, at 790 (probation revocation); Middendorf v. Henry, 425 U. S. 25, 48 (1976) (summary court-martial); Parham v. J. R., 442 U. S. 584, 599-600, 606-607, 610, n. 18 (1979) (commitment of minor to mental hospital); Vitek v. Jones, 445 U. S. 480, 497-500 (1980) (Powell, J., controlling opinion concurring in part) (transfer of prisoner to mental hospital). Indeed, the only circumstance in which the Court has found that due process categorically requires appointed counsel is juvenile delinquency proceedings, which the Court has described as “functionally akin to a criminal trial.” Scarpelli, supra, at 789, n. 12 (discussing In re Gault, supra); see ante, at 443.
Despite language in its opinions that suggests it could find otherwise, the Court’s consistent judgment has been that *455 fundamental fairness does not categorically require appointed counsel in any context outside of criminal proceedings. The majority is correct, therefore, that the Court’s precedent does not require appointed counsel in the absence of a deprivation of liberty. Ibid. But a more complete description of this Court’s cases is that even when liberty is at stake, the Court has required appointed counsel in a category of cases only where it would have found the Sixth Amendment required it — in criminal prosecutions.
HH 1 — I
The majority agrees that the Constitution does not entitle Turner to appointed counsel. But at the invitation of the Federal Government as amicus curiae, the majority holds that his contempt hearing violated the Due Process Clause for an entirely different reason, which the parties have never raised: The family court’s procedures “were inadequate to ensure an accurate determination of [Turner’s] present ability to pay.” Brief for United States as Amicus Curiae 19 (capitalization and boldface type deleted); see ante, at 447-449. I would not reach this issue.
There are good reasons not to consider new issues raised for the first and only time in an amicus brief. As here, the new issue may be outside the question presented.[3] See Pet. for Cert, i (“Whether... an indigent defendant has no constitutional right to appointed counsel at a civil contempt proceeding that results in his incarceration”); see also ante, at 438 (identifying the conflict among lower courts as regarding *456 “the right to counsel”). As here, the new issue may not have been addressed by, or even presented to, the state court. See 387 S. C. 142, 144, 691 S. E. 2d 470, 472 (2010) (describing the only question as whether “the Sixth and Fourteenth Amendments of the United States Constitution guarantee [Turner], as an indigent defendant in family court, the right to appointed counsel”). As here, the parties may not have preserved the issue, leaving the record undeveloped. See Tr. of Oral Arg. 49, 43 (“The record is insufficient” regarding alternative procedures because “[tjhey were raised for the very first time at the merits stage here; so, there’s been no development”); Brief for Respondents 63. As here, the parties may not address the new issue in this Court, leaving its boundaries untested. See Brief for Petitioner 27, n. 15 (reiterating that “[t]he particular constitutional violation that Turner challenges in this case is the failure of the family court to appoint counsel”); Brief for Respondents 62 (declining to address the Government’s argument because it is not “properly before this Court” (capitalization and boldface type deleted). Finally, as here, a party may even oppose the position taken by its allegedly supportive amicus. See Tr. of Oral Arg. 7-12,14-15 (Turner’s counsel rejecting the Government’s argument that any procedures short of a categorical right to appointed counsel could satisfy due process); Reply Brief for Petitioner 14-15.
Accordingly, it is the wise and settled general practice of this Court not to consider an issue in the first instance, much less one raised only by an amicus. See this Court’s Rule 14.1(a) (“Only the questions set out in the petition, or fairly included therein, will be considered by the Court”); Adarand Constructors, Inc. v. Mineta, 534 U. S. 103, 110 (2001) (per curiam) (“[T]his is a court of final review and not first view” (internal quotation marks omitted)); United Parcel Service, Inc. v. Mitchell, 451 U. S. 56, 60, n. 2 (1981) (declining to consider an amicus’ argument “since it was not raised by *457 either of the parties here or below” and was outside the grant of certiorari). This is doubly true when we review the decision of a state court and triply so when the new issue is a constitutional matter. See McGoldrick v. Compagnie Generate Transatlantique, 309 U. S. 430, 434 (1940) (“[I]t is only in exceptional cases, and then only in cases coming from the federal courts, that [this Court] considers questions urged by a petitioner or appellant not pressed or passed upon in the courts below”); Cardinale v. Louisiana, 394 U. S. 437, 438 (1969) (“[T]he Court will not decide federal constitutional issues raised here for the first time on review of state court decisions”).
The majority errs in moving beyond the question that was litigated below, decided by the state courts, petitioned to this Court, and argued by the parties here, to resolve a question raised exclusively in the Federal Government’s amicus brief. In some cases, the Court properly affirms a lower court’s judgment on an alternative ground or accepts the persuasive argument of an amicus on a question that the parties have raised. See, e. g., United States v. Tinklenberg, 563 U. S. 647, 660 (2011). But it transforms a case entirely to vacate a state court’s judgment based on an alternative constitutional ground advanced only by an amicus and outside the question on which the petitioner sought (and this Court granted) review.
It should come as no surprise that the majority confines its analysis of the Federal Government’s new issue to acknowledging the Government’s “considerable experience” in the field of child support enforcement and then adopting the Government’s suggestions in toto. See ante, at 447-448. Perhaps if the issue had been preserved and briefed by the parties, the majority would have had alternative solutions or procedures to consider. See Tr. of Oral Arg. 43 (“[T]here’s been no development. We don’t know what other States are doing, the range of options out there”). The Federal Government’s interest in States’ child support enforcement *458 efforts may give the Government a valuable perspective,[4] but it does not overcome the strong reasons behind the Court’s practice of not considering new issues, raised and addressed only by an amicus, for the first time in this Court.
Ill
For the reasons explained in the previous two sections, I would not engage in the majority’s balancing analysis. But there is yet another reason not to undertake the Mathews v. Eldridge balancing test here. 424 U. S. 319 (1976). That test weighs an individual’s interest against that of the Government. Id., at 335 (identifying the opposing interest as “the Government’s interest”); Lassiter, 452 U. S., at 27 (same). It does not account for the interests of the child and custodial parent, who is usually the child’s mother. But their interests are the very reason for the child support obligation and the civil contempt proceedings that enforce it.
When fathers fail in their duty to pay child support, children suffer. See Candan, Meyer, & Han, Child Support: Responsible Fatherhood and the Quid Pro Quo, 635 Annals Am. Acad. Pol. & Soc. Sci. Í40, 153 (2011) (finding that child support plays an important role in reducing child poverty in single-parent homes); cf. Sorensen & Zibman, Getting To Know Poor Fathers Who Do Not Pay Child Support, 75 Soc. Serv. Rev. 420, 423 (2001) (finding that children whose fathers reside apart from them are 54 percent more likely to live in poverty than their fathers). Nonpayment or inadequate payment can press children and mothers into poverty. M. Garrison, The Goals and Limits of Child Support Policy, in Child Support: The Next Frontier 16 (J. Oldham & M. Melli eds. 2000); see also Dept, of Commerce, Census Bureau, *459 T. Grail, Custodial Mothers and Fathers and Their Child Support: 2007, pp. 4-5 (2009) (hereinafter Custodial Mothers and Fathers) (reporting that 27 percent of custodial mothers lived in poverty in 2007).
The interests of children and mothers who depend on child support are notoriously difficult to protect. See, e. g., Hicks v. Feiock, 485 U. S. 624, 644 (1988) (O’Connor, J., dissenting) ("The failure of enforcement efforts in this area has become a national scandal” (internal quotation marks omitted)). Less than half of all custodial parents receive the full amount of child support ordered; 24 percent of those owed support receive nothing at all. Custodial Mothers and Fathers 7; see also Dept, of Health and Human Services, Office of Child Support Enforcement, FY 2008 Annual Report to Congress, App. Ill, Table 71 (showing national child support arrears of $105.5 billion in 2008). In South Carolina alone, more than 139,000 noncustodial parents defaulted on their child support obligations during 2008, and at year end parents owed $1.17 billion in total arrears. Id., App. Ill, Tables 73 and 71.
That some fathers subject to a child support agreement report little or no income "does not mean they do not have the ability to pay any child support.” Dept, of Health and Human Services, E. Sorensen, L. Sousa, & S. Schaner, Assessing Child Support Arrears in Nine Large States and the Nation 22 (2007) (prepared by The Urban Institute) (hereinafter Assessing Arrears). Rather, many “deadbeat dads”[5] “opt to work in the underground economy” to “shield their earnings from child support enforcement efforts.” Mich. Sup. Ct., Task Force Report: The Underground Economy 10 (2010) (hereinafter Underground Economy). To avoid attempts to garnish their wages or otherwise enforce the support obligation, “deadbeats” quit their jobs, jump from job *460 to job, become self-employed, work under the table, or engage in illegal activity.[6] See Waller & Plotnick, Effective Child Support Policy for Low-Income Families: Evidence From Street Level Research, 20 J. Poky Analysis & Mgmt. 89, 104 (2001); Assessing Arrears 22-23.
Because of the difficulties in collecting payment through traditional enforcement mechanisms, many States also use civil contempt proceedings to coerce “deadbeats” into paying what they owe. The States that use civil contempt with the threat of detention find it a “highly effective” tool for collecting child support when nothing else works. Compendium of Responses Collected by the U. S. Dept, of Health and Human Services Office of Child Support Enforcement (Dec. 28,2010), reprinted in App. to Brief for Sen. DeMint et al. as Amici Curiae 7a; see id., at 3a, 9a. For example, Virginia, which uses civil contempt as “a last resort,” reports that in 2010 “deadbeats” paid approximately $13 million “either before a court hearing to avoid a contempt finding or after a court hearing to purge the contempt finding.” Id., at 13a~14a. Other States confirm that the mere threat of imprisonment is often quite effective because most contemners “will pay . . . rather than go to jail.” Id., at 4a; see also Underground Economy C-2 (“Many judges ... report that the prospect of [detention] often causes obligors to discover previously undisclosed resources that they can use to make child support payments”).
This case illustrates the point. After the family court imposed Turner’s weekly support obligation in June 2003, he made no payments until the court held him in contempt three months later, whereupon he paid over $1,000 to avoid confinement. App. 17a-18a, 131a. Three more times, Turner *461 refused to pay until the family court held him in contempt— then paid in short order. Id., at 23a-25a, 31a-34a, 125a-126a, 129a-130a.
Although I think that the majority’s analytical framework does not account for the interests that children and mothers have in effective and flexible methods to secure payment, I do not pass on the wisdom of the majority’s preferred procedures. Nor do I address the wisdom of the State’s decision to use certain methods of enforcement. Whether “deadbeat dads” should be threatened with incarceration is a policy judgment for state and federal lawmakers, as is the entire question of government involvement in the area of child support. See Elrod & Dale, Paradigm Shifts and Pendulum Swings in Child Custody, 42 Fam. L. Q. 381,382 (2008) (observing the “federalization of many areas of family law” (internal quotation marks omitted)). This and other repercussions of the shift away from the nuclear family are ultimately the business of the policymaking branches. See, e. g., D. Popenoe, Family in Decline in America, reprinted in War Over the Family 3, 4 (2005) (discussing “four major social trends” that emerged in the 1960’s “to signal a widespread ‘flight’” from the “nuclear family”); Krause, Child Support Reassessed, 24 Fam. L. Q. 1,16 (1990) (“Easy-come, easy-go marriage and casual cohabitation and procreation are on a collision course with the economic and social needs of children”); M. Boumil & J. Friedman, Deadbeat Dads 23-24 (1996) (“Many [children of deadbeat dads] are born out of wedlock .... Others have lost a parent to divorce at such a young age that they have little conscious memory of it”).
* * *
I would affirm the judgment of the South Carolina Supreme Court because the Due Process Clause does not provide a right to appointed counsel in civil contempt hearings that may lead to incarceration. As that is the only issue properly before the Court, I respectfully dissent.

 I agree with the Court that this case is not moot because the challenged action is likely to recur yet is so brief that it otherwise evades our review. Ante, at 439-441.

 “Criminal contempt is a crime in the ordinary sense”; therefore, criminal contemners are entitled to “the protections that the Constitution required of ouch criminal proceedings,” including the right to counsel. Mine Workers v. Bagwell, 512 U. S. 821, 826 (1994) (citing Cooke v. United States, 267 U. S. 517, 537 (1925); internal quotation marks omitted).

 Indeed, the new question is not one that would even merit certiorari. See this Court’s Rule 10. Because the family court received a form detailing Turner’s finances and the judge could not hold Turner in contempt without concluding that he could pay, the due process question that the majority answers reduces to a faetbound assessment of the family court’s performance. See ante, at 447-449; Reply Brief for Petitioner 14-15 (“[I]n advance of his hearing, Turner supplied to the family court just such a form”).

 See, e.g., Deadbeat Parents Punishment Act of 1998, 112 Stat. 618; Child Support Recovery Act of 1992, 106 Stat. 3403; Child Support Enforcement Amendments of 1984, 98 Stat. 1305; Social Services Amendments of 1974, 88 Stat. 2337.

 See Deadbeat Parents Punishment Act of 1998,112 Stat. 618 (referring to parents who “willfully fai[l] to pay a support obligation” as “[d]ead-beat [p]arents”).

 In this case, Turner switched between eight different jobs in three years, which made wage withholding difficult. App. 12a, 18a, 24a, 47a, 53a, 136a-139a. Most recently, Turner sold drugs in 2009 and 2010 but paid not a penny in child support during those years. Id., at 105a-llla; App. to Brief for Respondents 16a, 21a-24a, 29a-32a, 37a-54a.